71 Cal.App.3d 547 (1977)
139 Cal. Rptr. 509
THE PEOPLE, Plaintiff and Respondent,
v.
FERNANDO RODRIGUEZ, Defendant and Appellant.
Docket No. 28786.
Court of Appeals of California, Second District, Division Four.
July 7, 1977.
*549 COUNSEL
Wilbur F. Littlefield, Public Defender, Harold E. Shabo, Michael Adelson and Leighton A. Nugent, Deputy Public Defenders, for Defendant and Appellant.
Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Edward T. Fogel, Jr., and Carol Wendelin Pollack, Deputy Attorneys General, for Plaintiff and Respondent.
OPINION
KINGSLEY, Acting P.J.
Defendant appeals from a judgment (order granting probation). For the reasons set forth below, we reverse the order.
(1) (See fn. 1.) On information from an informant, police officers obtained a warrant authorizing search of defendant's residence, automobile and person.[1] The police, armed with that warrant, observed defendant driving his automobile. They stopped him. As the officers approached the vehicle they saw defendant swallow several small balloons.[2] They arrested him and took him to a police station for interrogation. About an hour later, the police took defendant to a hospital where, at their request, an emetic was administered, through a nasal tube, causing defendant to regurgitate the balloons. On examination the balloons were found to contain heroin.
A motion under section 1538.5 of the Penal Code to suppress the balloons as evidence was made and denied. Thereafter, pursuant to a *550 plea bargain, defendant was found guilty of possession of heroin and was granted probation.[3]
On the present appeal, defendant contends only that the section 1538.5 motion should have been granted. We agree and therefore reverse the order.
Defendant relies primarily on the decision by the Supreme Court in People v. Bracamonte (1975) 15 Cal.3d 394 [124 Cal. Rptr. 528, 540 P.2d 624].[4] In that case, as here, the police had seen defendant swallow balloons reasonably thought to contain heroin. They took her to a hospital where, through coercion, she submitted to a similar infusion of an emetic,[5] causing regurgitation of the balloons. On the facts of that case, the Supreme Court held that an unconstitutional search had occurred and reversed the conviction. There are, however, some significant factual differences between Bracamonte and the case at bench:
(1) In Bracamonte, the doctor ordering the procedure acted solely on his belief that the warrant (there as here authorizing only search of the person) was authority for his action. He testified that he did not regard the case as one of a medical emergency. In our case there was conflicting medical testimony as to the existence of an emergency.
(2) In Bracamonte, although the trial court had admitted the balloons as evidence, it had found that there was no medical emergency. In our case there was a finding by the trial court that there was a medical emergency.
For the reasons set forth below, we conclude that those differences do not permit us to uphold the search herein involved.

*551 I
(2) In determining the constitutional validity of a search, this court is bound by the factual determination by the trial court concerning the circumstances leading up to, and involving, the search; but we are obligated to make our own, independent, examination of those circumstances for the purpose of determining whether they meet the constitutional standard for a valid search. (Witkin, Cal. Evidence (2d ed. 1966) § 67, p. 66; Cal. Criminal Law Practice (Cont.Ed.Bar. No. 23, 1964) § 5.50, p. 214.)
Thus we approach the case at bench as one in which defendant made no physical resistance, was not handcuffed, and suffered no pain. But we must decide, for ourselves, whether, on those facts and the evidence hereinafter discussed, a medical emergency did exist.

II
We point out that, unlike People v. Jones (1971) 20 Cal. App.3d 201 [97 Cal. Rptr. 492], on which the People here rely, there was neither consent by the defendant nor a clear indication that a narcotic had already been infused into the defendant's digestive system. The rule by which we are guided was thus stated by the Supreme Court in Bracamonte, 15 Cal.3d 394, 403-404 [124 Cal. Rptr. 528, 540 P.2d 624]. "[N]ot only must there be more than probable cause to believe that contraband will be found [citations], but to justify a search incident to a lawful arrest, there must also be the need to prevent the arrested person from obtaining a weapon or destroying evidence....
"...................
"Our judgment herein is necessarily based on the record before us. There is, of course, no right to conceal or destroy evidence of criminal conduct. If, in the instant case, there was reasonable cause to believe that the balloons would not pass through the digestive tract but instead would break open and thereby dissipate, not only would the potential health hazard possibly justify the intrusion into defendant's stomach, but the fear of the destruction of evidence might also justify remedial action." (People v. Bracamonte (1975) supra, 15 Cal.3d 394, 403-404.) (Italics added.)
Accepting that tentative dictum as the rule to be followed here, we turn to examine the medical testimony.
*552 After testifying concerning his education and experience, and testifying that the officers had told him that defendant had swallowed balloons believed to contain heroin, Dr. Parr, the physician who had directed the procedure herein involved, testified as follows:
"Q. From your training and experience, did you form an opinion as to what necessary medical treatment to administer to Mr. Rodriguez?
"A. It was my opinion that he needed to have his stomach emptied.
"THE COURT: For what reason?
"THE WITNESS: He had ingested a significant amount of heroin. He could be in danger of having a toxic reaction.
"BY MR. FORK: [Deputy District Attorney.]
"Q. Would that be true by the fact that the heroin might be contained in some balloons or other containers?
"A. The medical journal articles pointed out that various types of rubber balloons do dissolve in gastric acid."
On cross-examination Dr. Parr testified as follows:
"Q. What sort of examination did you perform on Mr. Rodriguez?
"A. Well, basically, looking at him, ascertaining that he was in no apparent distress, checked his pupils for size and looked over the rest of the body.
"I found a small quarter-inch of laceration on his right ring finger.
"Q. Anything significant about his pupillary response or size?
"A. According to my record, they were mid-size and reacted, which would be normal pupillary size and reaction.
"Q. Did he seem to be in any sort of distress?
"A. According to my record, he was in no apparent distress.
*553 "Q. Then he was a perfectly normal person, without any physical signs; is that correct?
"A. Aside from the laceration on his finger.
"Q. Other than the laceration on his finger, there was absolutely nothing wrong as far as your physical diagnosis was concerned; is that correct?
"A. That's correct.
"Q. Did he consent to your treatment?
"A. I don't know.
"Q. Did he refuse treatment?
"A. I don't recall. I do see that he didn't sign the chart.
"Q. Isn't it a fact that you treated Mr. Rodriguez on the orders of the Police Department or the two individuals?
"A. I treated him on the basis of my medical judgment.
"Q. What was that medical judgment?
"A. That had he ingested heroin, that if I did not treat him, I could possibly endanger his life or his life would be in danger.
"Q. Did you at that time see any signs of heroin ingestion?
"A. No, I did not. If you wait for the signs, it might be too late.
"THE COURT: In order [sic] words, you relied upon what the police officers told you?
"THE WITNESS: I felt they were honest.
"BY MR. NAKANO: [Deputy Public Defender.]
"Q. What time was it that you first saw Mr. Rodriguez?
*554 "A. According to my chart, he was clocked in to the emergency room at 10:48, I think, 10:42.
"Q. In the evening?
"A. In the evening.
"Q. What was the date?
"A. 5-29-74.
"Q. Going back to your experience, Dr. Parr, you are a resident in internal medicine?
"A. That's correct.
"Q. What areas does that cover?
"A. The whole field of internal medicine, broken down into many subspecialties.
"Q. What is your subspecialty?
"A. Cardiology.
"Q. You are a cardiologist?
"A. Yes.
"Q. What is your training in drug usage?
"A. Well, my pharmacology courses.
"Q. That was in medical school?
"A. Yes.
"Q. Isn't that the effects of drugs on the physiological system?
"A. That is essentially the content of the course.
"Q. You have no degree in chemistry or engineering, do you?
*555 "A. I am not a chemist, no.
"Q. You don't know the effect of stomach acids or juices on rubber, do you?
"MR. FORK: Objection; argumentative.
"THE COURT: Overruled.
"THE WITNESS; I think the effects of gastric acid on rubber, if you use the term generically, there are many different kinds of plastics and latens and different rubber compounds. Some are disintegrated by stomach acid and some have no effect.
"I think you have to specify the chemical makeup of the compound you are referring to, as rubber before you can make any judgment as to whether or not it would be affected or not affected by gastric acid.
"BY MR. NAKANO:
"Q. Are you familiar with toy balloons?
"A. Not specifically, although I am familiar with the fact that they are made from different substances.
"Q. There are some that are made out of synthetics?
"THE COURT: I don't think that would be material, what is known to the doctor here and what his beliefs were, not his knowledge on all kinds of toy balloons.
"BY MR. NAKANO:
"Q. Dr. Parr, essentially, you based your decision on treating, forcibly treating Mr. Rodriguez on the representations of the police officers; isn't that correct?
*556 "A. That's correct.
"Q. You didn't base your treatment on any physical observations that you made of Mr. Rodriguez on that evening; isn't that correct?
"A. That's correct.
"Q. He was not in distress?
"A. No.
"Q. He was not in imminent danger of losing his life according to your diagnosis?
"THE COURT: He stated he relied upon them, but he was of the belief that he was in danger of his health, because he was relying upon what the officers said.
"MR. NAKANO: I am asking him if he 
"THE COURT: He has already been asked and answered that he didn't know anything at all except what he was relying upon, what the officers told him.
"I think it has been covered and you are assuming he made other diagnoses and he didn't state that he did.
"BY MR. NAKANO:
"Q. Did you make any other tests?
"A. No.
"Q. The sum total of your physical examination was looking at the defendant's pupils, examining his body and determining whether or not  and the information received by the police officers; isn't that correct?
"A. That is what I based my treatment on, that's correct.
*557 "THE COURT: I think to clarify it, and it is clear to the Court, that you relied upon what the police officers told you in determining that there was a danger.
"THE WITNESS: Apparently Mr. Rodriguez denied having ingested anything. I felt that there were extraneous circumstances which would lead to his denial, even though he possibly ingested a toxic substance, and I felt he should be treated on this basis."
The defendant offered the testimony of Dr. Nelson, who had testified in Bracamonte. That testimony was contained in Dr. Nelson's deposition given in that case and received in evidence in this case. Dr. Nelson's testimony was to the effect that it was possible that a balloon might be dissolved by the gastric juices in the stomach, might be torn by sharp objects, such as nuts, in the stomach, might leak slowly because not securely fastened, and might be delayed or prevented from passing through the intestines by reason of some obstruction in that part of the digestive system. He testified that the chances of any of those things happening were very small, probably less than 1 percent.
(3) We can find in neither Dr. Parr's testimony nor in that of Dr. Nelson anything more than that, a careful physician, knowing that his patient had swallowed heroin-filled balloons, would, out of care for the patient, recommend the use of an emetic to induce vomiting of those objects. Such care by a physician is commendable, but the caution of a doctor with his private patient, is not justification for the routine use of that procedure on an unwilling arrestee. In Bracamonte, our Supreme Court, quoting from Schmerber v. California (1966) 384 U.S. 757, 772 [16 L.Ed.2d 908, 920, 86 S.Ct. 1826], said (15 Cal.3d 394 at p. 404): "We are mindful of the Supreme Court's warning in Schmerber that `[t]he integrity of an individual's person is a cherished value of our society. That we today hold that the Constitution does not forbid the States minor intrusions into an individual's body under stringently limited conditions in no way indicates that it permits more substantial intrusions, or intrusions under other conditions.'"
In light of that expressed concern for the sanctity of the body even of an arrestee, we cannot say that the record here before us supports a finding that the procedure here used, on an unwilling and unconsenting arrestee, was justified either as a means to prevent the loss of the contraband or as a necessary precaution for his life. Nothing in this record justifies any conclusion but that, had the normal processes of *558 digestion and elimination been allowed to take their course, the balloons would have been recovered and defendant been healthy.
The judgment is reversed.
Jefferson, J., concurred.
DUNN, J.
I respectfully dissent.
It seems to me that the testimony does not warrant a reversal.
Dr. Parr testified that: "A. It was my opinion that he needed to have his stomach emptied.... He had ingested a significant amount of heroin. He could be in danger of having a toxic reaction."
"A. I treated him on the basis of my medical judgment.... That he had ingested heroin, that if I did not treat him, I could possibly endanger his life or his life would be in danger."
"THE WITNESS: I think the effects of gastric acid on rubber, if you use the term generically, there are many different kinds of plastics and latens and different rubber compounds. Some are disintegrated by stomach acid and some have no effect."
The defense testimony by Dr. Nelson, that less than I percent of balloons might be dissolved by gastric juices is not conclusive.
I would sustain the judgment.
A petition for a rehearing was denied July 27, 1977, and respondent's petition for a hearing by the Supreme Court was denied September 1, 1977.
NOTES
[1] The validity of the warrant is not herein contested. However, a warrant authorizing search of the person does not authorize an intrusion into the body of the individual involved. (People v. Bracamonte (1975) 15 Cal.3d 394, 400-401 [124 Cal. Rptr. 528, 540 P.2d 624].)
[2] It is not here contended that the officers did not have reasonable cause to believe that the balloons contained heroin.
[3] The section 1538.5 motion was heard and decided by Judge Parker; the plea bargain and sentence were before Judge Hinz. It is not contended that the proceedings before Judge Hinz were improper if the section 1538.5 motion was properly denied. It follows that it is Judge Parker's ruling which we consider on this appeal.
[4] Defendant also relies on Vasquez v. Superior Court (1962) 199 Cal. App.2d 61 [18 Cal. Rptr. 140]. However, in Vasquez there was evidence that extraordinary force had been used in administering the emetic. In our case, as we shall point out, that element is not present.
[5] In Bracamonte an attempt was made to administer the emetic by use of a tube. Because that procedure caused the defendant pain, she agreed to oral administration. Here, defendant refused oral administration and the doctor resorted to the tube method. The difference is not material. In both cases defendant refused to submit to the procedure; in both cases the procedure was the result of police restraint.