[Crim. No. 31964. Second Dist., Div. One. Nov. 30, 1978.]

THE PEOPLE, Plaintiff and Appellant, v.
CHARLES BERNARD ALLEN, Defendant and Appellant.

### COUNSEL

John K. Van de Kamp, District Attorney, Harry B. Sondheim, Donald J. Kaplan and George M. Palmer, Deputy District Attorneys, for Plaintiff and Appellant.

Frank Duncan for Defendant and Appellant.

### OPINION

**LILLIE, Acting P. J.**—The trial court found defendant guilty of possession for sale of heroin. Both defendant and the People appeal from the judgment (order granting probation), defendant challenging the denial of his motion to suppress pursuant to section 1538.5, Penal Code, the People, the validity of the order granting probation.

#### DEFENDANT'S APPEAL

Based on information that one Reeves was dealing heroin from his residence and that he had previous narcotic arrests, Officers Gilbert and Seegers went to Reeves' house and knocked; in response to a voice asking who was there, Officer Gilbert identified himself; they heard the sound of running from the door and a toilet flushing and believing narcotics were being destroyed, kicked open the door and observed Reeves just outside

of the bathroom; Reeves hedged but finally admitted he had just flushed heroin down the toilet; asked if he had any dope in the house, Reeves responded no; asked, "You don't care if we search, do you?" Reeves answered "No, knock yourself out. You can search all you want"; the residence was searched and no narcotics were found.

Reeves was never arrested, handcuffed, told that the officers would take him to the station for investigation or threatened. Officer Gilbert told Reeves he had no case on him because he "got rid" of the heroin but "the guy I'm really interested in is the guy you're getting your stuff from"; they talked and became "pretty friendly," and Reeves told him about "Blue," he had been buying heroin from him for sometime and the time and place of sale were always set up by telephone, and he offered to call "Blue." Reeves had no telephone and voluntarily went to the station to make the call.

By telephone Reeves made arrangements with "Blue" to meet him for the sale of $50 worth of heroin at a certain liquor store where "Blue" intended to meet others for the same purpose; Reeves told Officer Gilbert that "Blue" packaged heroin in small balloons; the officers were informed that "Blue" often carried narcotics in his mouth as is common practice among dealers. Reeves was taken to the liquor store and instructed to signal when he saw "Blue;" an automobile matching the description given by Reeves and driven by defendant, who matched the description of "Blue," moved into the area; Reeves gave his signal and Officer Elliott approached defendant, identified himself, pointed his revolver "real close to his head" and ordered him to open his mouth whereupon defendant spit out five balloons of heroin; the gun did not touch defendant's throat; at the same time Officer Gilbert pointed his gun at defendant's head ordering him to spit out the balloons, but he denied anyone said "Spit it up or I'll blow your head off."

Defendant testified that Officer Elliott stuck a gun in his face through the car window, and Officer Gilbert jumped into the car and stuck the gun in his neck and said "Spit it out, you mother, or I'll blow your F-ing brains out."; three guns in all were jammed in his neck and he was frightened; he could not swallow because the guns were stuck in his neck; had he the opportunity, he "probably" would have swallowed the balloons of heroin.

There is substantial evidence in the record to support the trial court's finding that "even assuming arguendo that the original entry into Mr.

Reeves' home was illegal, . . . the chain leading to [defendant] is quite an attenuated one and that any taint has been dissipated because of the independent [voluntary] conduct of Mr. Reeves," and that defendant's arrest was lawful.

■ On the issue of the admissibility of the evidence, the trial court found that the officers "held a gun near [defendant's] head, possibly at his throat, possibly only a few inches from his head" and, notwithstanding the denial of Officer Gilbert, was "inclined to believe [defendant] that they said in words and substance, 'Spit it out or I'll blow your head off.' " We are bound by this factual finding because it is supported by the evidence. In denying the motion the court commented that this conduct was very "disturbing" from a safety standpoint and a "very dangerous practice," but concluded it was not unlawful conduct.

Appellant attacks the admissibility of the evidence on both due process (U.S. Const., 14th Amend., § 1; Cal. Const., art. I, § 15) and unreasonable search and seizure (U.S. Const., 4th Amend., 14th Amend., § 1; Cal. Const., art. I, § 13) grounds under *Rochin* v. *California* (1952) 342 U.S. 165 [96 L.Ed. 183, 72 S.Ct. 205, 25 A.L.R.2d 1396] and *People* v. *Bracamonte,* 15 Cal.3d 394 [124 Cal.Rptr. 528, 540 P.2d 624]. He identifies with defendant in those cases in which police intrusion into the human body was condemned. (*Rochin* v. *California, supra,* 342 U.S. 165, 166 [96 L.Ed. 183, 186-187] [stomach forcibly pumped out]; *People* v. *Bracamonte, supra,* 15 Cal.3d 394, 398; *People* v. *Rodriguez,* 71 Cal.App.3d 547, 549 [139 Cal.Rptr. 509] [emetic administered through nasal tube]; *People* v. *Kraft,* 3 Cal.App.3d 890, 896 [84 Cal.Rptr. 280] [blood sample forcibly obtained]; *People* v. *Sanders,* 268 Cal.App.2d 802, 805 [74 Cal.Rptr. 350] [judo choking technique to prevent swallowing]; *United States* v. *Cameron* (9th Cir. 1976) 538 F.2d 254, 256 [rectal cavity probed and enema administered].)

In *Rochin* v. *California, supra,* 342 U.S. 165, the high court held that the administration of an emetic solution—" 'stomach pumping' produced vomiting" (p. 166 [96 L.Ed. p. 187])—constituted impermissible police activity which shocked the conscience and offended basic concepts of due process under the due process clause of the Fourteenth Amendment, and reversed the conviction. Although such conduct presented an issue of constitutional dimensions under the Fourth Amendment, the court did not consider it because the exclusionary rule was not then applicable to the states. (See *People* v. *Bracamonte,* 15 Cal.3d 394, 399-400 [124 Cal.Rptr. 528, 540 P.2d 624].) In 1975 the California Supreme Court

decided *People* v. *Bracamonte* on the search and seizure ground finding it unnecessary to reach the due process contentions. In *People* v. *Scott* (1978) 21 Cal.3d 284 [145 Cal.Rptr. 876, 578 P.2d 123] the high court barred evidence obtained by a prostate massage administered in the rectum of a suspect. The facts in *Bracamonte* differ from those at bench but we detect the same coercion in both cases and the same elements that bring into focus the Fourth and Fourteenth Amendments and California parallel provisions under which "[s]earches are proscribed which are not justified under the circumstances or which are made in an improper manner. [Citation.]" (*People* v. *Bracamonte, supra,* 15 Cal.3d 394, 400.) As in *Bracamonte,* it cannot be asserted here that defendant willfully and voluntarily ejected the balloons from his mouth. On the search and seizure issue, the court said at page 403 "not only must there be more than probable cause to believe that contraband will be found [citations], but to justify a search incident to a lawful arrest, there must also be the need to prevent the arrested person from obtaining a weapon or destroying evidence." (*People* v. *Bracamonte,* 15 Cal.3d 394.)

The trial court found, and properly so, there was probable cause to believe defendant was concealing the contraband in his mouth. But the weapon possibility is not here applicable even though the trial court commented it was appropriate to have guns drawn at the time of a felony arrest of one unknown to them who "may be armed or dangerous or present some kind of threat." Though an officer may use such force as is necessary to accomplish a felon's arrest (§ 835a, Pen. Code), it was never contended here that the officers' conduct was for that purpose. Nor did either officer articulate any fear for himself or others or any belief defendant might be armed or dangerous. The conclusion is inescapable that the guns and threat were used for neither the arrest nor protection but to force defendant to spit out the evidence. Nor, under the circumstances, is the destruction of evidence possibility applicable here. Defendant did testify that he spit out the balloons because he was scared and had no choice but admitted that had he had the opportunity he "probably" would have swallowed them. Assuming, however, that he had swallowed the balloons, there was no reason to believe that the evidence would be destroyed. While there is no right to conceal or destroy evidence of criminal conduct (*People* v. *Bracamonte, supra,* 15 Cal.3d 394, 404) nothing in the record supports any fear of destruction of evidence which might justify the action taken herein. "It thus appears that defendant in the instant case easily could have been transported to jail and placed in an isolation cell and kept under proper surveillance." (*People* v. *Bracamonte, supra,* 15 Cal.3d 394, 404; *People* v. *Rodriguez, supra,* 71

Cal.App.3d 548, 557-558.) Actually the prosecutor in his argument on the section 1538.5 motion flirted with this resolution of the situation as "the better course . . . to let it pass out of the body and then recover them."[1]

The People contend that defendant was not choked or brutalized as in *Rochin, Bracamonte, Rodriguez, Kraft, Sanders* and *Cameron,* the force used was no more than was reasonably necessary to prevent destruction of the evidence and the conduct of the officers simply does not descend to the level of indignities found in those cases. There is little comfort for the People in their quote from *People* v. *Bass,* 214 Cal.App.2d 742 [29 Cal.Rptr. 778], "Although we agree that physical evidence, like verbal confessions, may not be 'tortured' from the lips of the accused, it does not follow that merely because a suspect has placed a substance behind his lips, he necessarily is entitled to cry 'sanctuary' when the officer of the law, under appropriate circumstances, directs him to surrender it." (P. 746.) Of course each case must be decided on its own factual situation, and the "appropriate circumstances" in *Bass* included no weapon, threat, use of force or choking. The officer merely placed his hand on defendant's neck to prevent him from swallowing and ordered him to "Spit it out," which he did. Further, the People assert, calling attention to *People* v. *Rand,* 23 Cal.App.3d 579 [100 Cal.Rptr. 473] and cases cited therein, that the officer's threat to blow defendant's head off "was never intended to be carried out if defendant resisted," but was simply "a ruse," proper under the circumstances. First, nothing in the record supports the assertion that it was "a ruse" or concerns the officer's intention in connection with the threat. All that the evidence shows is that the officers were surprised when defendant immediately spit out the contraband. Second, defendant did not know it was "a ruse" and that the threat was "never intended" to be carried out, nor do we.[2] Third, the "ruse," trick or strategy referred to in *People* v. *Rand, supra,* 23 Cal.App.3d 579 and cases cited therein (pp. 582-583) cannot be equated with two officers holding

---

[1]It was never contended, and there is no evidence that defendant would have been in any danger had he swallowed the rubber balloons. Of course, there is always a possibility that the rubber balloon can break open while in the digestive tract but it is a common practice among dealers to carry heroin in balloons in the mouth for the obvious purpose of swallowing the evidence if apprehended.

[2]Defendant who is black testified that the officers were Caucasian, he was alone in his car in the area of Century and Figueroa, it was dark, he was scared, his main concern was "survival," not getting "hurt," "shot or killed," three guns (the officers testified there were only two) were aimed at his head and "If they'd shot me, it was dark and . . . I would have been just another dead person" without any "witnesses." Defendant assumed, and under the circumstances we cannot say he had no right to make the assumption, that had he physically resisted or failed to obey the order he would have been shot in the head.

guns at a suspect's head ordering him to spit out contraband or they would blow his head off.

Defendant was not handcuffed and suffered no physical pain—the trial court discounted his claim that the guns were jammed in his throat preventing him from swallowing—but it cannot be denied that he suffered fear, anxiety and the real prospect that he would suffer physical harm or death. (See *United States* v. *Cameron* (9th Cir. 1976) 538 F.2d 254, 258.) Only pure speculation would support either the People's assertion that the police did not intend to shoot or the reality of defendant's fear that they would carry out their threat, but we agree as asserted by the trial judge, that such conduct is very "disturbing" and "a dangerous practice," and by appellant that the physical and emotional response such threat could evoke well might cause the officer with an "itchy trigger finger" to believe that he had justifiable cause to follow through with the threat which he was capable of immediately carrying out. We also agree with the trial court that had defendant not spit out the contraband there would have been "no basis whatsoever for following through any such threat. It would be totally without justification to pull the trigger." Needless to say, on the record here, the officers were aggressive beyond all need; their conduct can do no less than encourage violent confrontations between suspects and police.

We are unable to conclude that there is any basis upon which to uphold this search, and the balloons should not have been received in evidence. In light of the foregoing we deem it unnecessary to reach the merits of appellant's due process claims, or to examine the substance of the People's appeal.

The judgment (order granting probation) is reversed.

**THOMPSON, J.**—I concur in the typically clear analysis of controlling precedent in the opinion of Justice Lillie and consequently in its result. This concurring opinion is impelled by the thought that a rift has developed in the seamless web of California decisional law which should be noted on the possibility that its presence may induce our Supreme Court to reconsider its decisions in *People* v. *Bracamonte* (1975) 15 Cal.3d 394 [124 Cal.Rptr. 528, 540 P.2d 624], and *People* v. *Scott* (1978) 21 Cal.3d 284 [145 Cal.Rptr. 876, 578 P.2d 123].

*Bracamonte* holds that the use of an emetic by medical personnel to cause a suspect to vomit is such a violation of " 'integrity of an

individual's person' " as to render the process the equivalent of an illegal search where another alternative to obtain the evidence, there the course of nature, is present. (*People* v. *Bracamonte, supra,* 15 Cal.3d at p. 404.) In *Scott,* our high court held that a bodily intrusion in the form of a physician-administered prostate massage to the rectum of a suspect to obtain a semen sample is a "significant invasion of both dignity and privacy . . . [i]nvolving . . . the most intimate of bodily functions . . . as extreme as the forced regurgitation at issue in *Bracamonte* and *Rochin* [v. *California* (1952) 342 U.S. 165 (96 L.Ed. 183, 72 S.Ct. 205, 25 A.L.R.2d 1396)]. . . ." (*People* v. *Scott, supra,* 21 Cal.3d at p. 294.) Hence *Scott* bars evidence of guilt, there indicia of a venereal disease transmitted to a victim of child molestation, obtained in the process.

In contrast, our Supreme Court held some five weeks after its decision in *Scott* that a defendant's conduct in assaulting a female victim of a burglary by rape, forcible sodomy, and forcible oral copulation, so as to cause great psychological trauma manifested in part by vomiting, could not reasonably have been intended by the Legislature to have been encompassed within the definition of infliction of "great bodily injury" as that phrase is used to enhance the penalty for burglary. (*People* v. *Caudillo* (1978) 21 Cal.3d 562, 582 [146 Cal.Rptr. 859, 580 P.2d 274].)

The invasion upon the "dignity and privacy" of the female victim in *Caudillo* seems to me to be no less an intrusion upon her "most intimate of bodily functions" than was the prostate massage administered to the suspect in *Scott.* The regurgitation experienced by the victim in *Caudillo* by the defendant's forcing her to orally copulate him seems to me to be no less traumatic to the victim than was the regurgitation by medically approved means imposed upon the suspect in *Bracamonte.*

I hence see no way in which *Caudillo* can be reconciled with *Bracamonte* and *Scott.* Certainly psychic trauma can cause as great or greater injury to the body than can purely physical trauma. So long as the conduct in *Caudillo* is characterized as of a nature which the Legislature could not reasonably have intended to be included in the definition of infliction of "great bodily injury," conduct of a less drastic character causing results similar to those described in *Bracamonte* and *Scott* seemingly cannot be characterized as shocking to the conscience to the extent it is so described in *Bracamonte* and *Scott.*

We, of course, are bound by *Bracamonte* and *Scott* as they protect persons suspected of crimes from police conduct seeking relevant

evidence of guilt. We are equally bound by *Caudillo* as it protects defendants from enhancement of a prison term. I suggest, however, that *Caudillo,* which post-dates *Bracamonte* and *Scott,* appears to require that the earlier cases be reconsidered.

**HANSON, J.**—I respectfully dissent from those portions of my colleagues' opinions which address defendant Allen's appeal and which conclude that the judgment of conviction must be reversed on the ground that the trial court improperly denied defendant's motion made pursuant to Penal Code section 1538.5 (hereinafter section 1538.5) to suppress as evidence the four balloons of heroin which he spit out of his mouth.[1] I would affirm the judgment of conviction.

Additionally addressing the People's appeal since the trial court did not sentence defendant to state prison but granted him probation, I would remand the matter to the trial court for resentencing in compliance with the mandatory provisions of Penal Code section 1203 (hereinafter section 1203) which require, under the circumstances present here, that the sentencing court affirmatively find and state on the record the "specific circumstances" which render the case so "unusual" that the interests of justice would best be served by granting defendant probation.

DEFENDANT'S APPEAL (THE MOTION TO SUPPRESS): I would affirm the judgment of conviction for the following reasons:

FIRST: The cases cited by my colleagues as controlling precedent to support their conclusions that the trial court erred in denying defendant's section 1538.5 motion to suppress evidence are all factually distinguishable and do not compel such a result under the circumstances of the instant case. The cases cited all involved either a choking or involuntary

---

[1]"Hans W. Mattick of the Center for Research in Criminal Justice in Chicago somewhat indelicately but nevertheless accurately likened the criminal justice system to a vacuum cleaner: the police—the mouth and suction power; the courts—the hose; and the prisons—the bag." (*People v. Holly* (1976) 62 Cal.App.3d 797, 809-810 [133 Cal.Rptr. 331] (dis. opn. of Hanson, J.) fn. omitted.)

Here once again a felon, guilty of possessing heroin for sale, is allowed to go free through a "hole" in the "hose" by the application and further extension of the irrational exclusionary rule which has created an upside-down system of criminal justice by diverting the focus of the criminal prosecution from the guilt or innocence of the defendant to a trial of the police. (See *People v. Swearingen* (1978) 84 Cal.App.3d 570, 578-582 [148 Cal.Rptr. 755] (dis. opn. of Hanson, J.) fns. 3-4, which recommends alternative methods for protecting individual Fourth Amendment rights; see also Wilkey, *The Exclusionary Rule—Should the criminal go free because the constable blundered?* (Nov. 1978) 62 Judicature, pp. 214-232.)

police intrusion into the orifices of the human body (forcible use of a stomach pump, emetic solution to force vomiting, enema or prostrate massage) to recover the contraband or evidence. In the case at bench there was no choking and no physical intrusion of defendant's body surface by the police.

The conduct of the officers in the instant case in no way descends to the level of "indignities" present in the cases relied on in my colleagues' opinions. "It is clear from a reading of these decisions, . . . that the courts were there concerned with condemning the excessive force exerted upon the individual rather than making the 'mouth' a sacred orifice into which contraband may be placed and thereafter disposed of in leisurely fashion. Although [I] agree that physical evidence, like verbal confessions, may not be 'tortured' from the lips of the accused, it does not follow that merely because a suspect has placed a substance behind his lips, he necessarily is entitled to cry 'sanctuary' when the officer of the law, under appropriate circumstances [as here], directs him to surrender it." (*People v. Bass* (1963) 214 Cal.App.2d 742, 746 [29 Cal.Rptr. 778].)

SECOND: "In the final analysis the test here is, as it always is, whether under the facts and circumstances and on the total atmosphere of the case the officer's conduct was reasonable (*People v. Ingle*, 53 Cal.2d 407, 412 [. . .]) when tested against the standard of a reasonable officer who is experienced in the 'devious and cunning devices used by narcotics offenders to conceal their crimes.' (*People v. Williams*, 196 Cal.App.2d 726, 728 [. . .].)" (*People v. Trevino* (1977) 72 Cal.App.3d 686, 690 [140 Cal.Rptr. 243].)

"A proceeding under section 1538.5 to suppress evidence is a full hearing on the issues before the superior court sitting as finder of fact. [Citations.] The power to judge credibility of witnesses, resolve conflicts in testimony, weigh evidence and draw factual inferences, is vested in the trial court. On appeal all presumptions favor proper exercise of that power, and the trial court's findings—whether express or implied—must be upheld if supported by substantial evidence. [Citations.]" (*People v. Superior Court (Keithley)* (1975) 13 Cal.3d 406, 410 [118 Cal.Rptr. 617, 530 P.2d 585].)

In the case at bench the record reflects that the police officers clearly had probable cause to believe that defendant was at the location to make a sale of heroin and that he (Blue), as is a common practice among heroin dealers, was carrying his lethal merchandise in balloons hidden in

his mouth for delivery at the time of the sale or to swallow in the case of imminent apprehension by the police. Since the officers were about to make a felony arrest of an unknown and possibly armed suspect, they were certainly authorized, in order to insure their own safety because of the hazardous nature of the activity, to have their pistols drawn (none of which were cocked) and to point them at defendant's head in order to dissuade him from thinking he had time to pull a gun and shoot them in an effort to escape arrest.

Therefore, the only factor superimposed on the above scene upon which my colleagues base their conclusion of "unreasonable" police activity requiring reversal under the exclusionary rule is merely the simultaneous utterance by the police of the following words in street jargon: "Spit it out, you mother, or I'll blow your F-ing brains out." The obvious purpose of that lexicon was for the shock reaction effect in hopes defendant would be startled into the reflex response of spitting out the balloons of heroin. It worked. He did. It was stipulated the 4 balloons contained 3.6 grams of heroin and 2 expert narcotic officers were of the opinion they were possessed for sale which is borne out by the facts.

I am unaware of any statutory or case law that goes so far as to control the verbal actual language of police officers under such exigent circumstances. As a practical matter police officers in conducting their war against drug dealers and pushers in trying to bring the rampant narcotic problems under control simply cannot reasonably be expected to always use the Queen's English or adhere to the Marquis of Queensberry rules and still perform their official duties under such circumstances. Having concluded that under the circumstances the officers were certainly authorized to have their pistols drawn and pointed at defendant, would their conduct be permissible if an officer had only said: "Spit it out, you mother?" Would the conduct be permissible if he only said: "Spit it out." It is certainly doubtful defendant would have spit up the balloons of heroin if the officers had merely pointed their fingers at him and said: "Boo." In fact defendant testified he would have "probably" swallowed the balloons of heroin.

Here, the trial court impliedly found that the strong words used by the officers in ordering defendant to empty his mouth were in the form of a "ruse" or "ploy" to shock defendant into spitting out the balloons of heroin and were not unreasonable under all the circumstances. I agree. The fact that there were at least three officer witnesses in the immediate presence of defendant would clearly indicate they had no intention

whatsoever of firing their weapons if defendant did not spit out the balloons. The testimony that Officer Dick Lloyd Elliott (the one whom defendant said used the words) commented later, "Hey, I can't believe this. The guy just spit it right out when I said spit it out. It just came right out," constituted substantial evidence to support the trial court's implied finding that the police officers merely used the words as a "ruse" or "ploy" to shock defendant into spitting out the four balloons of heroin and did not constitute impermissible police conduct.

THIRD: Even by analogy applying the stringent balancing test for determining whether a search warrant should be authorized for an actual bodily intrusion as described in *People* v. *Scott* (1978) 21 Cal.3d 284 [145 Cal.Rptr. 876, 578 P.2d 123] (distinguished from the instant case in that here no search warrant was sought and there was no bodily intrusion), the scales of justice are tipped heavily against a finding of impermissible police activity in the instant case.

In *Scott* the balancing test to determine whether the character of the search is appropriate lists the following factors to be considered: the reliability of the method to be employed; the seriousness of the underlying criminal offense and society's consequent interest in obtaining a conviction; the strength of law enforcement suspicions that evidence of crime will be revealed; the importance of the evidence sought; and the possibility that the evidence may be recovered by alternative means less violative of Fourth Amendment freedoms. The foregoing considerations are, in turn, to be balanced against the severity of the proposed intrusion.

Applying the above standards to the instant case, here the method used was a "ruse" by the use of words which did not involve a physical bodily intrusion.

The seriousness of the underlying criminal offense is great in view of the impact of the mushrooming narcotic problem on society. "All reports indicate drug abuse in the United States continues on the upswing, running virtually out of control and spreading to all levels of society. The cost of drug abuse is staggering, . . . More than 5,000 Americans die each year from drug overdose. The total cost to Americans is up to $17 billion a year. A large percentage of the absence of Americans' personal safety on the streets, in their businesses, and homes is directly attributed to the drug problem. In fact, it is estimated that as much as one-half of all robberies, muggings and burglaries are committed by drug addicts to support their habits. . . ." (*People* v. *Holly, supra*, 62 Cal.App.3d 797, 809 (dis. opn. of Hanson, J.), fn. omitted.)

The officers' suspicions that defendant was carrying the balloons of heroin in his mouth were justified by the fact that defendant in fact spat them out. Recovery of the balloons of heroin was important in that in narcotics cases (possession, possession for sale and sale) the recovery of the actual contraband is often essential for a conviction.

In balancing the alternative means which are less violative of Fourth Amendment freedoms we should also consider the constitutional rights of the citizens to be free of the by-product of the narcotic traffickers by way of the robberies, muggings and burglaries committed by drug addicts to support their habits and the rights of law enforcement officers in the performance of their official duties.

In my opinion the tactics used in the present case to startle defendant into spitting out the balloons of heroin were much more preferable and reasonable than the alternative alluded to by my colleagues (citing *People v. Bracamonte* (1975) 15 Cal.3d 394 [124 Cal.Rptr. 528, 540 P.2d 624]), namely to allow defendant to swallow the balloons, transport him to jail, place him in isolation until he defecates and then recover the balloons of heroin from his excretion. In the first place there is the danger and distinct possibility that defendant's life could be in jeopardy from an overdose by the balloons rupturing from stomach acids. Secondly, in my view the obscene and ridiculous indignity imposed on law enforcement officers by requiring them in performance of their official duties to paw through a dope pusher's feces to retrieve evidence far outweighs any loss of "dignity and privacy" which may have been experienced by defendant by reason of the means employed in the instant case.

Here, also the severity of the intrusion was minimal consisting only of the shock reaction of words as opposed to methods involving actual bodily intrusion. I further conclude that no other constitutional rights of defendant were violated including due process.

THE PEOPLE'S APPEAL (SECTION 1203): I would remand this case to the trial court for resentencing to comply with the mandatory provisions of section 1203.

Section 1203 in pertinent part provides that the superior court has the authority to grant probation, upon the application of a convicted felon, where the person convicted is eligible for probation, and where "the court determines that there are circumstances in mitigation of the punishment prescribed by law or that the ends of justice would be subserved by

granting probation to the person." (§ 1203, subd. (a).) It further provides in subdivision (d) that "[e]xcept in *unusual* cases where the interests of justice would best be served if the person is granted probation, probation shall not be granted" (italics added) to anyone who has been convicted twice previously of a felony or to anyone who has been convicted once previously of a felony wherein "[h]e used or attempted to use a deadly weapon upon a human being in connection with the perpetration of such previous crime" (subd. (d)(6)(ii)) or who "willfully inflicted great bodily injury or torture in the perpetration of such previous crime." (Subd. (d)(6)(iii).) Finally, it provides in subdivision (e) that when probation is granted to a person who comes within one or more of the provisions of section 1203, subdivision (d), listed above "the court *shall* specify the circumstances indicating that the interests of justice would best be served by such a disposition." (Italics added.)

The word "shall" when used in the context of section 1203 has been held to indicate a mandatory directive and the court has no discretion and *must* comply with the requirements of the statute. (*People* v. *Municipal Court* [*Lozano*] (1956) 145 Cal.App.2d 767, 775-778 [303 P.2d 375]; *Parks* v. *Superior Court* (1971) 19 Cal.App.3d 188, 191 [96 Cal.Rptr. 645]; *People* v. *Johnson* (1955) 134 Cal.App.2d 140, 144 [285 P.2d 74].)

Here, defendant Allen was found guilty of possession for sale of heroin, and two alleged prior felony convictions were found true by the court and not disturbed at the time of the sentencing hearing. Thus, defendant falls within the provisions of subdivision (d)(4) of section 1203 requiring that probation not be granted except in an "unusual" case. In addition, the record shows defendant also falls within the provisions of subdivisions (d)(6)(ii) and (d)(6)(iii) because in the earlier prior conviction he used a deadly weapon in connection with an assault which inflicted great bodily injury upon the victim. Therefore, the record on appeal shows that defendant Allen was not entitled to a grant of probation absent a specific finding by the court that the case was "unusual" and a statement of the reasons therefor which the court did not do.

In the case at bench the probation report listed defendant's prior criminal activity and recommended probation be denied and the prosecuting attorney brought the provisions of section 1203 to the trial court's attention. The trial court suspended proceedings and placed defendant on probation for five years on condition, among others, that he

spend the first year in local custody without specifying on the record the circumstances for such a grant of probation as required by section 1203.

The record on appeal, in my view, does not disclose circumstances to justify the granting of probation and the appropriate sentence would appear to be state prison for the term prescribed by law.

However, I would remand the case to the trial court for resentencing for the purpose of allowing the court to state the specifications required by section 1203 if it can do so.

A petition for a rehearing was denied December 21, 1978, and the petition of the plaintiff and appellant for a hearing by the Supreme Court was denied January 24, 1979.