[No. G005222. Fourth Dist., Div. Three. Mar. 23, 1989.]

THE PEOPLE, Plaintiff and Respondent, v.
RICHARD JAMES CAPPELLIA, Defendant and Appellant.

**COUNSEL**

John L. King, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Rudolf Corona, Jr., and Roy W. Hewitt, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

SCOVILLE, P. J.—After a jury trial, defendant Richard James Cappellia was convicted of offering to sell heroin. (Health & Saf. Code, § 11352.) Defendant contends the court (1) improperly denied his pretrial motion to suppress evidence, and (2) improperly refused to admit into evidence certain postarrest police conduct which supported a defense of entrapment. We disagree, and affirm the judgment.

I

The police had been informed defendant was selling heroin from a barbershop in Huntington Beach. On December 19, 1985, defendant agreed to sell heroin the following day to Officer Gildea, a plainclothes investigator with the Huntington Beach Police Department, if Gildea would "slam," or inject the drug, in front of him. When Gildea returned on December 20, defendant said he did not really trust Gildea, and wanted to see him "slam" because he knew a policeman would not inject the drug. Gildea said he would "slam" at his house in Santa Ana, which was agreeable to defendant.

As they prepared to leave, defendant went to the back of his shop, removed a toilet paper roll from the shelf, and said he was ready to go. The two left in Gildea's truck and headed towards Santa Ana. On the way there, Gildea could see "the plunger and the body of the syringe protruding from the . . . open end of the toilet paper roll." Defendant also opened up a small cardboard matchbox and showed Gildea three small bindles of tar heroin wrapped in cellophane. Gildea testified the bindles did not look sealed, and that he thought they were only twisted closed.

When they arrived at the house on Ninth Street in Santa Ana, defendant saw Officer Poe, another plainclothes policeman, seated on a fence in front of the house. Defendant asked Gildea who Poe was because he did not like "fixing" in front of strangers. Gildea said he was merely a friend who was there to drop off some merchandise and leave. Defendant then pulled out the matchbox and placed the three bindles in his mouth.

Defendant put the toilet paper roll in the glove compartment, got out of the car, and began walking along the concrete driveway with Gildea in front of him and Poe directly behind him. Gildea suddenly turned around, identified himself as a police officer, and yelled to Poe that defendant "had it in his mouth." Defendant turned and took a step as if to run, but Gildea grabbed him around the lower part of the neck with his right hand "to prevent him from swallowing and to keep his Adam's apple from going down." Gildea's hand was in a V-shape with the thumb on one side of

defendant's throat and the rest of his fingers on the other side. Gildea specifically denied using the carotid hold.

Poe also grabbed defendant's neck because he "didn't want him to swallow the evidence": the evidence might have been lost, and it might also "break open, and he might overdose on it." He felt if he constricted defendant's throat defendant "wouldn't be able to get anything down it." Poe put his thumbs on the back of defendant's neck and his fingers around the front by defendant's Adam's apple. He testified he held on "just strong enough so that [defendant] wasn't able to swallow." Poe denied putting pressure on the carotid artery.

As the officers grabbed defendant, the three of them accidentally tumbled to the ground. Defendant fell face first and began bleeding from the nose and the mouth. Defendant struggled violently, and tried to move his neck out of the officers' grip. Gildea testified defendant's mouth was "moving like he was trying to chew" and "it appeared that he was trying to get something into the back of his mouth to swallow it." Gildea yelled at defendant to spit out the bindles, but he refused. When Gildea reached into defendant's mouth to retrieve the drugs, defendant bit his finger. Defendant struggled for nearly two minutes before the police were able to handcuff him. When he stopped fighting, Gildea let go of his throat and asked defendant to open his mouth, which he did. Gildea reached in and pulled out two bindles of heroin. Gildea testified the bindles appeared to have been chewed, and there was blood on the inside and outside of them. The officers looked but could not find the third bindle.

The police testified that defendant never stopped breathing or lost consciousness during the struggle. They also testified that after they let go of his throat defendant did not faint, gasp for air, or groan in pain.

Defendant was arrested and charged with offering to sell heroin. Defendant made a pretrial motion to suppress evidence under Penal Code section 1538.5 on the grounds there were no exigent circumstances which justified the search of his mouth, and the police used excessive force to recover the narcotics. In denying the motion, the trial court found that while the police placed their hands around defendant's throat, "[t]here was no carotid hold" and the police did not use excessive force in conducting the search.

Defendant was tried and found guilty by a jury of offering to sell heroin in violation of Health and Safety Code section 11352.

## II

Defendant challenges the warrantless search on two grounds. First, he argues the search was unconstitutional because the police used excessive

force. Second, he asserts the search was unjustified because there were no exigent circumstances. ■ In reviewing a challenged search or seizure, we must uphold the trial court's factual findings if those findings are supported by substantial evidence (*People v. Siripongs* (1988) 45 Cal.3d 548, 566-567 [247 Cal.Rptr. 729, 754 P.2d 1306]), but we are required to exercise our independent judgment when measuring those facts against the constitutional standard of reasonableness. (*People v. Williams* (1988) 45 Cal.3d 1268, 1301 [248 Cal.Rptr. 834, 756 P.2d 221].)

### A.

■ Because there is substantial, uncontroverted evidence to support the finding that the police used only that force necessary to prevent defendant from swallowing the bindles, and that they did not choke him, we must accept that finding as true. Our task therefore is limited to determining whether, in our independent judgment, the force used was constitutionally reasonable. We hold it was.

■ The police may, in order to prevent the destruction of evidence, reach into a person's mouth to recover evidence if there is sufficient probable cause to believe a crime is being, or has been, committed. (*People v. Lara* (1980) 108 Cal.App.3d 237, 240-241 [166 Cal.Rptr. 475].) The mouth is not a "sacred orifice" and "there is no constitutional right to destroy or dispose of evidence . . . ." (*People v. Bracamonte* (1975) 15 Cal.3d 394, 405, fn. 6 [124 Cal.Rptr. 528, 540 P.2d 624].) ■ Here, there was probable cause to justify a search of defendant's mouth since Gildea saw defendant put the heroin there. (*People v. Lilienthal* (1978) 22 Cal.3d 891, 898-899 [150 Cal.Rptr. 910, 587 P.2d 706]; *United States v. Caldera* (9th Cir. 1970) 421 F.2d 152, 153.)

■ The police may not, however, use brutal or excessive force to recover evidence. (*People v. Bracamonte, supra,* 15 Cal.3d at p. 405, fn. 6.) California cases have uniformly held it is excessive force to choke or use a choke hold to make a defendant spit out evidence secreted in the mouth. (See, e.g., *People v. Sanders* (1969) 268 Cal.App.2d 802, 804-806 [74 Cal.Rptr. 350]; *People v. Taylor* (1961) 191 Cal.App.2d 817, 821 [13 Cal.Rptr. 73]; *People v. Brinson* (1961) 191 Cal.App.2d 253, 256 [12 Cal.Rptr. 625]; *People v. Martinez* (1954) 130 Cal.App.2d 54, 57-58 [278 P.2d 26]; cf. *People v. Bracamonte, supra,* 15 Cal.3d at pp. 404-405; *Rochin v. California* (1952) 342 U.S. 165 [96 L.Ed. 183, 72 S.Ct. 205, 25 A.L.R.2d 1396]; see also 2 Witkin, Cal. Evidence (3d ed. 1986) Witnesses, §§ 1347-1348, pp. 1304-1305.) California cases have also held it is not excessive force for the police to place their hands on a defendant's throat in order to prevent evidence from being swallowed, so long as they do not choke him.

(See, e.g., *People* v. *Miller* (1967) 248 Cal.App.2d 731, 735 [56 Cal.Rptr. 865]; *People* v. *Mora* (1965) 238 Cal.App.2d 1, 3-4 [47 Cal.Rptr. 338]; *People* v. *Bass* (1963) 214 Cal.App.2d 742, 745-746 [29 Cal.Rptr. 778]; *People* v. *Sanchez* (1961) 189 Cal.App.2d 720, 727-728 [11 Cal.Rptr. 407]; see also 2 Witkin, *op. cit. supra,* at pp. 1305-1306.)

 Although the trial court found that the police did not choke defendant, he argues the police used excessive force because they prevented his Adam's apple from moving up and down. He asserts this conduct was dangerous and was akin to the choke hold which was condemned in *People* v. *Sanders, supra,* 268 Cal.App.2d at page 805.

While at least one case has found it constitutionally permissible to prevent the destruction of evidence by holding a defendant's Adam's apple to prevent swallowing (*People* v. *Dickenson* (1962) 210 Cal.App.2d 127, 136-137 [26 Cal.Rptr. 601]), we note one case has hinted that it may be constitutionally unreasonable for the police to put their hands on a defendant's throat at all. In *People* v. *Trevino* (1977) 72 Cal.App.3d 686, 692 [140 Cal.Rptr. 243], the court noted that the "application of force to a person's throat is a dangerous and sensitive activity," and implied that the use of force to prevent swallowing might be constitutionally unreasonable as the equivalent of choking. (See also *Carleton* v. *Superior Court* (1985) 170 Cal.App.3d 1182, 1195-1197 [216 Cal.Rptr. 890] (dis. opn. of Staniforth, Acting P. J.); *People* v. *Lara, supra,* 108 Cal.App.3d at p. 242.) Of course, the comment in *Trevino* is merely dictum, but it is dictum which has been interpreted by some as the law in California. (See, e.g., 2 LaFave, Search and Seizure (2d ed. 1987) § 5.2(i), p. 472.)[1]

Given these conflicting views, we must begin our analysis as to the constitutionality of such police conduct by returning to the seminal case of *Rochin* v. *California, supra,* 342 U.S. 165.

In *Rochin,* the United States Supreme Court reversed a judgment of conviction because it found the police course of conduct—jumping on the defendant, searching his mouth, and then pumping his stomach in order to retrieve two morphine capsules—to be conduct which "shocks the conscience" and offends "even hardened sensibilities." (*Id.* at p. 172.)[2] Although courts often review police conduct under *Rochin*'s "shock the conscience" standard, modern Supreme Court decisions are grounded on

---

[1] Part of the problem may be that LaFave quotes language which was deleted when *Trevino* was modified on denial of rehearing.

[2] We note *Rochin* was decided on due process grounds and at a time when the Fourth Amendment exclusionary rule had not been made applicable to the states. (2 LaFave, Search and Seizure, *op. cit. supra,* at p. 471.)

whether the search was "reasonable" under the circumstances. (*Winston* v. *Lee* (1985) 470 U.S. 753, 760-763 [84 L.Ed.2d 662, 668-671, 105 S.Ct. 1611]; *Schmerber* v. *California* (1966) 384 U.S. 757, 771 [16 L.Ed.2d 908, 920, 86 S.Ct. 1826]; see also *Jauregui* v. *Superior Court* (1986) 179 Cal.App.3d 1160, 1166 [225 Cal.Rptr. 308].) ■ In determining if the conduct was reasonable, we must consider (1) whether there was probable cause to conduct the search, (2) whether the procedure used "may threaten the safety or health of the person," and (3) whether the search would damage the individual's sense of "personal privacy and bodily integrity." (*Winston* v. *Lee, supra,* 470 U.S. at pp. 761-762 [84 L.Ed.2d at pp. 669-670].) Applying these factors to the facts as found by the trial court, the police conduct was not constitutionally unreasonable.

■ There was, of course, probable cause to conduct the search since the police saw defendant place the narcotics in his mouth. In addition, a search of the mouth does not damage a person's sense of personal privacy and security. Just as a blood test is a routine part of ordinary life (*Schmerber* v. *California, supra,* 384 U.S. at p. 771, fn. 13 [16 L.Ed.2d at p. 920]), so is an oral examination. The significant question, then, is whether the procedure used by the police threatened defendant's health or safety. It did not.

Although defendant suffered a bloody nose during the incident, that fact is not dispositive since it is uncontroverted the injury was an accident which came about largely as a result of defendant's efforts to elude arrest and destroy the evidence. What is important here is that the trial court specifically found the police did not choke defendant. The court also found that the police, in placing their hands around defendant's throat, neither impaired defendant's breathing nor caused him to gasp, choke, or cry out in pain. We agree that the "application of force to a person's throat is a dangerous and sensitive activity" and that it "is the type of force that, more than any other, is likely to result in violent resistance" (*People* v. *Trevino, supra,* 72 Cal.App.3d at p. 692), but the application of such force is not, as *Trevino* suggests, per se unreasonable, excessive, or a threat to a defendant's health or safety. It may be difficult for the officer in the field to discern whether too much force is being used in a particular case, but "it makes little sense to say that the minimal pressure necessary to prevent swallowing is excessive, particularly when it is considered that if the drugs are swallowed the defendant may be harmed by them and may have to submit to an even more disagreeable procedure for his own protection or for retrieval of the evidence." (2 LaFave, *op. cit. supra,* p. 473.)

A rule which permits the police to use minimal force around the neck to prevent a defendant from destroying evidence by swallowing it is in accord with federal authorities (see, e.g., *Espinoza* v. *United States* (5th Cir. 1960)

278 F.2d 802, *cert. den.* 364 U.S. 827 [5 L.Ed.2d 55, 81 S.Ct. 65] (1960); *United States* v. *Caldera, supra,* 421 F.2d 152, 153; *United States* v. *Harrison* (D.C. Cir. 1970) 432 F.2d 1328, 1330 [139 App.D.C. 266]; see also Annot. (1984) 66 A.L.R.Fed. 119, 162-164; but see *Alesi* v. *Craven* (9th Cir. 1971) 446 F.2d 742, 743-744), as well as authorities from other jurisdictions (see, e.g., *State* v. *Lewis* (1977) [566 P.2d 678, 681-682]; *State* v. *Jacques* (1978) [587 P.2d 861, 864-865]; *Foxall* v. *State* (1973) [298 N.E.2d 470, 474-477]; *State* v. *Winfrey* (La. 1978) 359 So.2d 73, 77; *People* v. *Holloway* (1982) [330 N.W.2d 405, 409-410], *cert. den.* 461 U.S. 917 [77 L.Ed.2d 288, 103 S.Ct. 1900] (1983); *State* v. *Santos* (1968) [243 A.2d 274, 275-276]; *Hernandez* v. *State* (Tex.Crim.App. 1977) 548 S.W.2d 904, 905; *State* v. *Taplin* (1984) [676 P.2d 504, 505-506]). Such a rule is also consistent with Proposition 8 which provided that " 'relevant evidence shall not be excluded in any criminal proceeding.' " (*In re Lance W.* (1985) 37 Cal.3d 873, 888 [694 P.2d 744]; see Cal. Const., art. I, § 28, added by initiative, Primary Elec. (June 8, 1982) commonly known as the Victims' Bill of Rights.) A packet of heroin retrieved from a defendant's mouth is clearly reliable and relevant evidence. (See *Stone* v. *Powell* (1976) 428 U.S. 465, 497 [49 L.Ed.2d 1067, 1089, 96 S.Ct. 3037] (conc. opn. of Burger, C. J.).)

We conclude, therefore, that the trial court was not required to suppress the evidence obtained here since the police only used that force necessary to prevent defendant from swallowing the drugs.

### B.

■ Next, defendant argues there were no exigent circumstances which justified the search because the police had no reasonable cause to believe that the bindles would not pass through defendant's digestive tract without being destroyed. Specifically, he asserts the police should have obtained a search warrant or waited until the packaged drugs passed through his system naturally. The argument ignores the record.

The police did have reasonable cause to believe the evidence would be destroyed if the bindles were swallowed. Gildea thought, incorrectly as it turned out, that the cellophane bindles were only twisted closed. In addition, he testified he had seen people die from swallowing drugs. Based on this knowledge, he reasonably assumed the evidence would be destroyed or defendant would be placed in a life-threatening situation. (Cf. *People* v. *Allen* (1978) 86 Cal.App.3d 948, 952 [150 Cal.Rptr. 568] [record did not support fear of destruction of evidence].) The fact the bindles turned out to be sealed instead of just twisted closed does not diminish the reasonableness of the officer's belief at the time the arrest was being made. No one can know for sure what the precise effect will be when packaged drugs are

swallowed (see *People* v. *Allen, supra,* 86 Cal.App.3d 948, 953, fn. 1; *Jauregui* v. *Superior Court, supra,* 179 Cal.App.3d at p. 1166), and this is especially true when the packages appear to be unsealed.

Thus, we conclude the police had reasonable cause to believe this was an "emergency situation" which required "swift action to prevent imminent danger to life . . . or destruction of evidence." (*People* v. *Ramey* (1976) 16 Cal.3d 263, 276 [127 Cal.Rptr. 629, 545 P.2d 1333]; *People* v. *Lanfrey* (1988) 204 Cal.App.3d 491, 508-509 [251 Cal.Rptr. 189].) Accordingly, Gildea was not required to forgo a legal warrantless search and wait to see if the bindles would pass naturally, or if a trial would become unnecessary. (See *People* v. *Bracamonte, supra,* 15 Cal.3d at p. 404.)

### III

■ Defendant contends the court improperly refused to admit into evidence certain postarrest police conduct which supported a defense of entrapment. Specifically, he wanted to question Gildea about a conversation which occurred some six to eight hours after the arrest in which Gildea allegedly offered defendant leniency if he would turn in his "connection." He argues Gildea's intent in inducing him to sell heroin is relevant to show Gildea was engaging in the type of overbearing conduct which constitutes entrapment, and that this evidence would provide the jury with a credible explanation as to why Gildea was so anxious to talk defendant into breaking the law. We are unpersuaded.

When defense counsel asked Gildea whether he talked with defendant about turning in his connection, the prosecutor objected on relevance grounds. Defense counsel said he had spoken with Gildea, and that Gildea confirmed defendant had been released on his own recognizance "to see if he would turn over his source." Defense counsel argued the evidence was thus relevant because it would show the police "didn't want [him] for the sales, they wanted to use him as a snitch, and when he didn't help them out, well, here he is." The court, believing the testimony did not go to the issue of guilt, sustained the objection under Evidence Code section 352.

The focus of inquiry when entrapment is raised as a defense is the *conduct* of the law enforcement officer *preceding* the offense. (*People* v. *Barraza* (1979) 23 Cal.3d 675, 689-690 [153 Cal.Rptr. 459, 591 P.2d 947].) The trier of fact must look to see "if the actions of the law enforcement agent would generate in a normally law-abiding person a motive for the crime other than ordinary criminal intent," or if there was "affirmative police conduct that would make commission of the crime unusually attractive." (*Id.* at p. 690.) While *Barraza* cautions that police conduct must not be viewed in a vacuum

(*ibid.*), nothing in that case suggests that one of the circumstances which the trier of fact is to consider is the subjective intent of the officer when he offers a suspect the opportunity to act unlawfully. Indeed, a subjective test based on the officer's intent would undermine the objective test endorsed by *Barraza*.

But even if the ruling had been erroneous, defendant was not prejudiced. He testified later as to his conversation with Gildea. Having so testified, he cannot now be heard to complain, especially when he elected not to recall Gildea as a witness.

The judgment is affirmed.

Moore, J., concurred.

**WALLIN, J.,** Concurring.—I very reluctantly concur. I find it hard to believe one can safely apply "the minimal pressure necessary to prevent swallowing" (maj. opn., *ante*, p. 1338, quoting 2 LaFave, Search and Seizure (2d ed. 1987) § 5.2(i), p. 473) while locked in a desperate struggle like the one here. As Justice Compton wrote in *People* v. *Trevino* (1977) 72 Cal.App.3d 686 [140 Cal.Rptr. 243]: "The application of force to a person's throat is a dangerous and sensitive activity. It is the type of force that, more than any other, is likely to result in violent resistance by the arrestee." (*Id.*, at p. 692.) I could not agree more.

The Attorney General, and the majority, contend the police did not choke Cappellia. They refer to mere hands on the throat, pressure to the Adam's apple, and "minimal force around the neck to prevent a defendant from destroying evidence by swallowing it . . . ." (Maj. opn., *ante*, p. 1338.) They should call a spade a spade. I invite my colleagues—who enjoy the benefit of a calm, controlled environment—to try swallowing an object while someone pressures the neck enough to prevent it. The swallowing reflex is a powerful one, and the considerable force required to thwart it can only be called "choking" by any forthright observer. Judges should not decide which police chokings are acceptable, and which are not, based on Orwellian newspeak.

The majority endorses police choking of suspects "as long as excessive force is not used." The distinction is doomed by its circularity: The type of force used here is, by definition, excessive. Furthermore, the reasonable force rationale was long ago rejected in *People* v. *Sanders* (1969) 268 Cal.App.2d 802 [74 Cal.Rptr. 350]. In *Sanders* the Attorney General took much the same position he does now, asserting "there was in fact no choking and that the force used was no more than was reasonably necessary to

prevent destruction of the narcotic evidence. He insist[ed] the term 'choking technique' [was] a misnomer for a legitimate hold commonly used in judo competition." (*People* v. *Sanders, supra,* 268 Cal.App.2d at p. 805.) The appellate court disagreed, although its rationale was based in part on the officer's testimony the hold in question could stop blood flow to the head, leading to unconsciousness. (*Ibid.*) Here, the officers testified their procedure did not pressure Cappellia's carotid artery nor impair his breathing, and the court made a finding to that effect.

Nevertheless, in my view the reasoning of *Sanders* is still persuasive. As stated in *People* v. *Parham* (1963) 60 Cal.2d 378 [33 Cal.Rptr. 497, 384 P.2d 1001], "Choking a man to extract evidence from his mouth violates due process." (*Id.,* at p. 384.) This was also the unanimous court's conclusion in *People* v. *Trevino, supra,* 72 Cal.App.3d 686, where Justice Compton wrote: "As to the amount of force that is permissible the cases uniformly reject the use of choking as a means of preventing the destruction of evidence or forcing defendant to disgorge it." (*Id.,* at p. 691.)

More recently, Justice Staniforth, dissenting in *Carleton* v. *Superior Court* (1985) 170 Cal.App.3d 1182, 1195-1197 [216 Cal.Rptr. 890], warned of the danger of permanent injury or even death from police choke holds. Relying on *Rochin* v. *California* (1952) 342 U.S. 165 [96 L.Ed. 183, 72 S.Ct. 205, 25 A.L.R.2d 1396], he observed "[t]he application of a choking force to a person's throat is a . . . violation of due process. [Citation.]"

I would hold *Rochin* and its progeny bar police from *ever* choking suspects to obtain evidence. (See *People* v. *Trevino, supra,* 72 Cal.App.3d at p. 692.) If that were the only consideration here, I would dissent and vote to reverse.

In this case, however, the trial court found the officers acted for two reasons: to obtain evidence, and to insure Cappellia did not die of an overdose from swallowing what the police thought were open bindles. I am highly dubious about the trial court's factual findings, particularly the latter. Cappellia was never given a chance to spit out the evidence. When Cappellia started to run, Officer Gildea grabbed him by the throat. With Gildea's hand in a V-shaped hold, the second officer, Poe, also grabbed Cappellia's neck and "constricted defendant's throat." (*Ante,* p. 1335.) The three then "accidentally" fell to the ground, breaking Cappellia's nose. Somehow the officers' belated concern for Cappellia's well-being strikes me as insincere. (This is especially true in light of the subsequent discovery the bindles were sealed, not open.)

Whatever I think of the trial court's factual findings, however, I am bound by them. Since the officers arguably acted to save Cappellia's life, it

cannot be said their conduct runs afoul of *Rochin*. But this court—and trial courts—should carefully scrutinize such claims in the future.