[No. D002197. Fourth Dist., Div. One. Aug. 9, 1985.]

ROBERT SCOTT CARLETON, Petitioner, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

COUNSEL

David R. Thompson for Petitioner.

No appearance for Respondent.

Edwin L. Miller, Jr., District Attorney, Peter C. Lehman and Edward J. Mantyla, Deputy District Attorneys, for Real Party in Interest.

OPINION

**WIENER, J.**—Robert Scott Carleton was charged with driving under the influence of alcohol (Veh. Code, § 23152, subd. (a)), felony hit and run (Veh. Code, § 20001) and two counts of vehicular manslaughter (Veh. Code, § 23153, subds. (a) and (b)). After his arrest, he was taken to the Vista Detention Facility (jail) and was asked to provide a sample of blood, breath or urine so his blood alcohol level could be determined. (Veh. Code, § 13353.) Carleton refused. A blood sample was forcibly extracted from his arm and the later test showed that approximately two hours after being stopped Carleton's blood/alcohol (BA) was .21. He unsuccessfully moved to suppress the blood and related test results on the basis (1) there were no exigent circumstances excusing the police from getting a warrant or (2) the circumstances surrounding the taking of blood ·violated his due process rights. Carleton then sought mandate or prohibition and requested a stay. We granted the stay pending response from the People and disposition of the matter. Believing there was substantial evidence to support the ruling, we, with Justice Staniforth dissenting, denied the petition and vacated the stay. (*People* v. *Ryan* (1981) 116 Cal.App.3d 168, 183 [171 Cal.Rptr. 854], petn. for hg. den., Apr. 1, 1981.) Carleton then successfully petitioned for a hearing in the California Supreme Court. That court transferred the case to itself and then retransferred it here directing us to issue an alternative writ. After argument and further briefing we again deny Carleton's petition.

I

 Carleton claims that factually the "emergency doctrine" of *People* v. *Superior Court (Hawkins)* (1972) 6 Cal.3d 757 [100 Cal.Rptr. 281, 493

P.2d 1145] cannot apply to him. Carleton's argument is tied to his conclusion that lacking an emergency a search warrant must be obtained before blood may be withdrawn from a suspect arrested for felony drunk driving. Recognizing his conclusion is inconsistent with *Hawkins,* Carleton asserts we must deviate from precedent to properly accommodate the technological advances since 1972 when *Hawkins* was decided. Carleton argues the record here illustrates that a telephonic search warrant can be obtained within minutes eliminating any risk of losing the evidence. Carleton also explains that increased knowledge enables experts to accurately extrapolate the BA to the time of the offense where the test is taken within a few hours after the incident giving rise to the arrest. We are unpersuaded.

*Hawkins* holds a search warrant is not required provided the defendant is under arrest, probable cause exists for taking the blood and the withdrawal is accomplished in a medically approved manner. Thus, our Supreme Court has created an exception to the need for a warrant following a felony drunk driving arrest by permitting blood to be withdrawn incidental to the lawful arrest. "It is clear . . . the Fourth Amendment does not bar a compulsory seizure, without a warrant, of a person's blood for the purposes of a blood alcohol test to determine intoxication, provided . . . the taking of the sample is done in a medically approved manner, is incident to a lawful arrest, and is based upon the reasonable belief . . . the person is intoxicated." (*Hawkins,* at p. 761.)

Even if Carleton were correct and *Hawkins* established an "emergency doctrine" we would hold an emergency was present on the facts of this case. Although it is theoretically possible to determine a person's BA level at the time he was driving, following the driver's arrest, there are numerous variables such as weight, or time and content of last meal which may affect the rate at which the alcohol dissipates. Parties whose blood alcohol level was .10 at the time of arrest would test well below that figure if, as would have been the case here had a warrant been sought, they were tested four hours after being stopped. The People have a legitimate and important interest in preventing the destruction of evidence by obtaining a sample as soon as possible. Accordingly, we conclude the facts here present the type of emergency situation where there is no need for a warrant. There was substantial evidence Carleton was intoxicated. The blood was taken after he was lawfully arrested.

## II

Carleton also argues the manner of obtaining his blood sample violated due process.

Whether blood may be taken from a defendant without his or her consent and used as evidence against him in his criminal trial has been a hotly debated question. Dissenting in *Breithaupt* v. *Abram* (1957) 352 U.S. 432 [1 L.Ed.2d 448, 77 S.Ct. 408], Chief Justice Warren had no hesitancy in asserting that lacking consent a defendant's blood test was inadmissible. "[I]t does not follow from the fact that a technique is a product of science or is in common, consensual use for other purposes that it can be used to extract evidence from a criminal defendant without his consent. Would the taking of spinal fluid from an unconscious person be condoned because such tests are commonly made and might be used as a scientific aid to law enforcement? [¶] Only personal reaction to the stomach pump and the blood test can distinguish them. To base the restriction which the Due Process Clause imposes on state criminal procedures upon such reactions is to build on shifting sands. We should, in my opinion, hold that due process means at least that law-enforcement officers in their efforts to obtain evidence from persons suspected of crime must stop short of bruising the body, breaking skin, puncturing tissue or extracting body fluids, whether they contemplate doing it by force or by stealth." (*Id.,* at p. 442 [1 L.Ed.2d at pp. 454-455].) The Chief Justice, however, did not succeed in persuading his brethren. A majority in *Breithaupt* decided there was nothing "brutal" or "offensive" in the taking of a sample of blood when done in a medically approved fashion. "The blood test procedure has become routine in our everyday life. It is a ritual for those going into the military service as well as those applying for marriage licenses. Many colleges require such tests before permitting entrance and literally millions of us have voluntarily gone through the same, though a longer, routine in becoming blood donors. . . . We, therefore, conclude that a blood test taken by a skilled technician is not such 'conduct that shocks the conscience,' [citation] nor such a method of obtaining evidence that it offends a 'sense of justice,'" [citation.] (*Id.,* at pp. 436-437 [1 L.Ed.2d at pp. 451-452].)

The same issue was examined further in *Schmerber* v. *California* (1966) 384 U.S. 757 [16 L.Ed.2d 908, 86 S.Ct. 1826]. There, at the direction of a police officer Schmerber's blood sample was taken by a physician at the hospital. Schmerber unsuccessfully argued admitting the blood denied him his rights under the Fourth, Fifth, Sixth and Fourteenth Amendments. *Schmerber* reiterated that the withdrawal of blood "did not offend 'that "sense of justice" of which we spoke in *Rochin* v. *California* [1952] 342 U.S. 165' . . . and nothing in the circumstances of this case or in supervening events persuades us that this aspect of *Breithaupt* should be overruled." (*Id.,* at p. 760 [16 L.Ed.2d at p. 913], fn. omitted.)

Recently in *Winston* v. *Lee* (1985) 470 U.S. — [84 L.Ed.2d 662, 105 S.Ct. 1611] the United States Supreme Court had occasion to review

*Schmerber* in a context where the People proposed to perform surgery on the defendant to remove a bullet lodged under his left collarbone. Although a unanimous court held this compelled surgical intrusion into an individual's body for evidence was unreasonable under the Fourth Amendment (*id.*, at p. — [84 L.Ed.2d at p. 672, 105 S.Ct. at p. 1620]), it again repeated the language in *Schmerber* quoting *Breithaupt* emphasizing the blood test procedure is routine. Taking blood must be "contrasted sharply with the practice in *Rochin v. California* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), in which police officers broke into a suspect's room, attempted to extract narcotics capsules he had put into his mouth, took him to a hospital, and directed that an emetic be administered to induce vomiting. . . . *Rochin* recognizing the individual's interest in 'human dignity' . . . held the search and seizure unconstitutional under the Due Process Clause." (*Winston,* at p. — [84 L.Ed.2d at p. 670, 105 S.Ct. at pp. 1617-1618, fn. 5].)

This lengthy introduction is for the purpose of emphasizing the substantial difference between taking sufficient blood for a blood test and the unconstitutional conduct condemned in *Rochin.* Conceptually here the taking of Carleton's blood sample for the test was not constitutionally forbidden. (*People v. Duroncelay* (1957) 48 Cal.2d 766, 770 [312 P.2d 690]; *People v. Ryan, supra,* 116 Cal.App.3d at pp. 181-183; *People v. Brannon* (1973) 32 Cal.App.3d 971 [108 Cal.Rptr. 620]; *People v. Fite* (1968) 267 Cal.App.2d 685, 690-691 [73 Cal.Rptr. 666].) It is only if Carleton's resistance to the test resulted in excessive police force that the possibility of unconstitutional conduct arises. ■ Law enforcement must act reasonably and use only that degree of force which is necessary to overcome a defendant's resistance in taking a blood sample.[1] Even where necessary to obtain a blood sample

---

[1]At oral argument we asked for supplemental briefing on the effect of *Hernandez v. Department of Motor Vehicles* (1981) 30 Cal.3d 70 [177 Cal.Rptr. 566, 634 P.2d 917] on *Schmerber* (and *People v. Duroncelay, supra,* 48 Cal.2d 766). We were concerned with language in *Hernandez* suggesting that Vehicle Code section 13353 was the legislative response to *Schmerber* permitting the defendant's refusal to take a blood test as barring further efforts to do so forcibly. (See *Hernandez, supra,* 30 Cal.3d at p. 77.) After reviewing the authorities presented including but not limited to *People v. Ryan, supra,* 116 Cal.App.3d 168, we conclude that there is no reason to deviate from existing precedent.

"[T]he desirability of obtaining blood samples in a noncoercive manner by one of the tests provided for in section 13353 may not be equated with constitutionality [citation]. It is well established that the government may utilize the results of chemical analysis performed upon a blood sample forcibly removed provided that (a) the removal is done in a reasonable, medically approved manner; (b) is incident to the defendant's arrest; and (c) is based upon the reasonable belief that the person is intoxicated. [Citations.]

". . . . . . . . . . . . . . . . . . . . . . . . .

". . . As our Supreme Court repeatedly emphasized, the taking of the defendant's blood for an alcohol test in a medically approved manner did not constitute brutality or shock the conscience even if it takes place against the will of the defendant and that in such circumstance the nonconsenting defendant may not well complain of denial of due process under the rule pronounced in *Rochin v. California, supra,* 342 U.S. 165. [Citations.]" (*Ryan, supra,* 116 Cal.App.3d at pp. 182-183.)

police may not act in a manner which will "shock the conscience." A defendant's arbitrary refusal to submit to a blood test will not excuse unlawful police conduct. It is within this legal framework that we must determine whether there is substantial evidence to support the court's findings the police acted lawfully.

### III

### A

 We approach this factual inquiry mindful that a trial court's Penal Code section 1538.5 ruling involves a two-step process. In the first step, a trial court makes factual findings to which we must give proper deference. " '[T]he power to judge the credibility of the witnesses, resolve any conflicts in the testimony, weigh the evidence and draw factual inferences, is vested in the trial court. On appeal all presumptions favor the exercise of that power, and the trial court's findings on such matters, whether express or implied, must be upheld if they are supported by substantial evidence.' " (*People* v. *Leyba* (1981) 29 Cal.3d 591, 596-597 [174 Cal.Rptr. 867, 629 P.2d 961].) It is only with reference to the second step, i.e., the legal effect of the factual findings that we can exercise our independent judgment. (*Id.*, at p. 597.)

### B

 Chronologically the events relating to Carleton's arrest and the later withdrawal of his blood occurred within three separate periods. The first occurred immediately following his arrest when he was taken to what the officers referred to as a receiving cell, the sallyport, of the jail; the second is when Carleton was taken to an isolation or safety cell where his blood was withdrawn; the last is when he was left alone in the safety cell and allegedly beaten. Since Carleton's argument is directed solely to what occurred during the withdrawal of his blood, evidence of what occurred during this last period is legally irrelevant to that issue. Events during this final period may not be used to blur the facts of the earlier periods before and during the taking of Carleton's blood sample.

### C

Carleton's Penal Code section 1538.5 motion was decided on both the evidence contained in the transcript of the preliminary hearing and live testimony in the superior court.

The preliminary hearing transcript contains the testimony of California Highway Patrol Officers Harvey L. Heaton (Heaton) and Charles F. George

(George). Heaton arrested Carleton; George investigated the accident. It also contains the testimony of sheriff's deputies Sergeant Robert James Plumbley (Plumbley), Scott Miller (Miller) and Norman Belstering (Belstering). The defense called Plumbley, Miller, Belstering and George.

The record of that hearing establishes Carleton was combative. Because of Carleton's resistance it was necessary for Plumbley to hold Carleton in what he described as a "carotid-restraint position, but without carotid unconsciousness I had one deputy on [Carleton's] left arm, one deputy on his right arm, and one deputy on each leg." Except for this force every witness denied Carleton was either physically or verbally abused.

### D

The live testimony adds a further dimension to what occurred. The People called Sheriff's Deputy Dan William Jopes (Jopes) and nurse Mary Ellen Pedersen (Pedersen). The defendant called Plumbley, Heaton, Carleton, Roy Gilbert (Gilbert) and Elizabeth Ann Reilly (Reilly).

Jopes testified he saw Carleton scuffling with Plumbley in the sallyport. Carleton was neither handcuffed nor shackled. Jopes restrained Carleton's left hand to keep him from striking anyone. At no time did he ever pull or push Carleton's left arm behind his back. No person struck, hit or otherwise physically abused Carleton.

Pedersen is an experienced registered nurse. She took Carleton's blood sample. When she first saw Carleton in the sallyport his clothes were all rumpled, he was extremely hostile, refused to answer questions, and refused to give his arm to the deputy to apply a wristband. The deputies tried to secure him so that his blood could be safely withdrawn. The actual withdrawal of the blood sample took just a few seconds. During this period of time Carleton was conscious. The blood was removed in a medically approved manner. Pedersen did not see anyone strike or abuse Carleton in any manner.

Plumbley and Heaton testified to essentially the same facts to which they had testified earlier in the preliminary hearing.

Carleton gave a different version of the events. He said that when he refused to hold his arm out through the bars a CHP officer "stuck it out and the deputy sheriff placed me in a headlock, and two other officers restrained my legs." Carleton said he was unable to physically resist because the officers had secured all of his limbs. The blood was taken from his right arm when he was facing the floor. After the blood was removed Carleton

said he received a blow to the head by an officer who had been holding him in a headlock. He was then led away by six officers and placed into a safety cell. In the safety cell he was forced to the ground, hit in the face and kicked in the ribs.

Gilbert and Reilly testified that when they saw Carleton shortly after he was released, his left eye was black and blue, there was an open cut below his eye on the tip of the cheek bone. His face was swollen on both sides and he was unable to move his left shoulder.

### E

Reviewing the facts the court found Carleton aggressively resisted the police requiring the officers to use a temporary carotid restraint for four or five seconds during which Carleton became limp. The court said this was the only time Carleton cooperated. The court found Carleton's active resistance required six law enforcement officers to control him.

The court disbelieved Carleton and rejected his testimony that he was required to place his arm through the bars of the cell. The court found Carleton's blood was withdrawn in the room adjacent to the sallyport when he was placed face down with police officers holding all four extremities essential for withdrawal of Carleton's blood sample in a medically approved fashion. The police acted reasonably since Carleton was a "threat to their own security." No police officer struck the defendant during or before the blood was withdrawn.

The trial court's statements reflect its reading and consideration of *People v. Kraft* (1970) 3 Cal.App.3d 890 [84 Cal.Rptr. 280]. In *Kraft* the court excluded the blood sample because the police used excessive force. The court nonetheless opined, "The driver accused of drunkenness is, if guilty, typically recalcitrant, obstreporous, and—not infrequently—belligerent. Greater restraints are necessary and, we think, to be condoned." (*Id.*, at p. 899.) Here when the trial court compared the facts before it to the facts of *Kraft* it said:

"Unlike *Kraft* wherein the court found that the defendant was defensive, and where the court found that the conduct of the officers was aggressive beyond all need, the court here finds that the amount of force used to assist the nurse in drawing the blood sample was necessary under the circumstances and otherwise generally reasonable.

". . . . . . . . . . . . . . . . . . . . .

"From the evidence before me, I find that in sum, considering the totality of the circumstances, the conscience of the court is not shocked, that the conduct of the police officers, although they had to use considerable strength and restraint on the defendant, was necessary because the defendant, himself, was resistive and aggressive. And, of course, they had to steady the one arm because any movement of that arm during the drawing of the blood, of course, would endanger the defendant by perhaps breaking a needle or causing some other injury to his arm, and, of course, they certainly didn't want that to happen."

## IV

The factual record supports the court's findings. The more difficult question is whether the court was legally correct in deciding the police conduct was lawful.

The degree of force necessary to overcome a defendant's resistance to the taking of a blood sample turns on the size and strength of the individual defendant. Less force will be necessary to restrain the proverbial 98-pound weakling. Considerably more force will be required to subdue the 280-pound weight lifting champion. At the outer extremes it may be impossible to control such physical behemoths without the use of tranquilizers propelled from dart guns similar to those used by veterinarians to pacify large animals. Such intrusions on humans would, of course, be constitutionally objectionable.

Here scientific assistance was unnecessary. Carleton was controlled by six persons all of whom were necessary to permit the withdrawal of his blood in a medically approved fashion. (See *People* v. *Ryan, supra,* 116 Cal.App.3d at p. 183 [defendant restrained by five police officers while a technician removed the blood sample].) Although this degree of force may approach the brink of excessiveness, it was not excessive. Carleton's self-induced brief physical restraint before and during the withdrawal of a blood sample is not conscience shocking.

Expert testimony on the defendant's blood alcohol at the time of driving is powerful evidence in a drunk driving case. Although the refusal to take a blood alcohol test may be used in court against the defendant, the impact of such refusal cannot be equated with the strength of direct evidence on that issue. Absent a clear legislative mandate giving a defendant absolute control of whether a blood alcohol test may be obtained, the lack of such evidence should not turn on the degree of a defendant's cooperation with a premium given to the more obstreperous drunk driver who is more successful in forcibly resisting the withdrawal of a blood sample. This should not suggest we would ever approve the use of unconstitutional means to

accomplish lawful ends. It is only to reflect the reality that to restrain a defendant reasonable force may be necessary to properly withdraw a blood sample from an actively resisting defendant. On the facts here we hold the court correctly admitted the blood test.

## DISPOSITION

Writ denied.

Work, J., concurred.

**STANIFORTH, Acting P. J.**—I respectfully dissent.

The majority in my view errs in two significant areas: (a) failing to examine and evaluate the conceded controlling facts of this case and (b) ignoring the substantial body of case law and statutes which deny any legal support for the specific challenged activities (use of carotid/karate restraint) of the officers here.

## I

First, as to the critical and undisputed facts. The court in ruling on Carleton's Penal Code 1538.5 motion held:

"I guess they could have talked to him for a long time and tried to talk him into it or calm him down or change his attitude, but I am satisfied that the facts here were that when confronted with that prospect, the defendant, *and he doesn't deny it, initially resisted with his left arm, tensing it, drawing it back. The police interpreted that, and not unreasonably, as not only resistance, but perhaps a threat to their own security.* . . .

"*[W]hen the police officer came and put a carotid restraint on him, there was a temporary, perhaps a couple of seconds, or as the defendant testified to, maybe four or five seconds, where he was limp, but that is the only evidence the court has before it as to the defendant's body essentially going in a limp fashion and otherwise cooperating.*" (Italics added.)

The factual finding of the police application of the carotid/karate restraint (commonly called choke hold or sleeper hold) is amply supported by the testimony not only of the officer who applied the restraint as well as those who observed it.

According to Officer Jopes, at a time when six officers and a nurse were trying to get blood from drunken Carleton by force or violence, "Sergeant

Plumbley had administered a neck restraint. I was holding the left arm, and there was approximately two or three other officers that were holding him down.''

"[By Mr. Koch]: You mentioned that Sergeant Plumbley had some sort of neck restraint around Mr. Carleton's neck.

"`. . . . . . . . . . . . . . . . . . . . . . . . .`

"If you could step down from the witness stand, and if you could demonstrate, please, the exact manner in which, if you recall to the best of your ability, you observed Sergeant Plumbley restraining the defendant?'' The witness complied. The court then asked defendant's counsel, Mr. Thompson, to "describe that.'' Mr. Thompson responded "It looks like a barbaric hold.''

Mr. Koch for the district attorney then described it:

"[T]he deputy has his right arm to the right portion of Mr. Koch's neck, and his right forearm wrapped around the neck and back over the left shoulder.

"It also appears as if Deputy Jopes' right hand is grasping his left hand, completing the circle.

"THE COURT: It appears that the Adam's apple or windpipe is the apex of the elbow of the deputy.''

"MR. KOCH: Your Honor, may it also reflect that there was, at least from my observation, there was no pressure being placed on the Adam's apple or neck area . . . .''

When further questioned about the use of this particular restraint, the deputy testified "something that you specifically avoid in that regard,'' that is, "any part of your arm against the Adam's apple or windpipe of the person restrained.'' From the foregoing testimony it is quite clear the carotid/karate restraint was placed on Carleton.

Carleton testified he offered to submit to a urine test. The district attorney conceded this offer was made but refused. The officer said "No, you are going to submit to a blood test.'' Carleton described a series of blows to his head and his body. Carleton testified the "headlock on my face caused some pain to my nose. I could taste some blood.'' He recalled seeing some stars for a short period of time. In this context, the blood was taken. He

was then taken to "safety cell." He said the "officers forced me directly to the floor of the cell."

The officers denied the use of any type of violence or that they injured Carleton in any respect, they denied kicking him in the ribs, striking him on the cheek or forcing him onto the floor on his face. The court made a finding that Carleton while in the rubber room was thrashing about, "probably very upset that he had been or his will had been overcome." The court further found "in the struggle, the police officers did cause substantial bruises both to his arms, perhaps wrenching his shoulder, caused in part by his own resistance. *Also, caused marks in and about his neck by virtue of the holds they had on him,* and that during all the scuffling more than likely his head, face, cheek and eye areas came into contact with police officers' arms, bodies, shoulders, floor and so forth."

The trial court concluded these activities were not shocking to the conscience of the court, citing the *Schmerber* and *Rochin* standards as authority.[1]

The majority cites no case to support application of the carotid/karate restraint described above in connection with the withdrawal of blood. The reason is obvious. This type of activity is without approval in the law. Whenever and wherever life endangering choking activity has been used by police, it has been disapproved by the court.

II

The cases cited by the majority to support its conclusion are correct statements of the law but of academic interest only. They do not reach the environs of the problem raised by these facts where a suspect was choked out in order to accomplish the taking of blood.

A suspect has no constitutional right to destroy or dispose of evidence. *People* v. *Duroncelay* (1957) 48 Cal.2d 766 [312 P.2d 690], holds there was no violation of *Rochin* standards (the defendant withdrew his arm as the nurse approached with a needle, and thereafter the ambulance driver held his arm to obtain the blood) and did not violate the standards of *Rochin* v. *California, supra,* 342 U.S. 165 [96 L.Ed. 183, 72 S.Ct. 205, 25 A.L.R.3d 1396].

In *People* v. *Ryan* (1981) 116 Cal.App.3d 168 [171 Cal.Rptr. 854], five officers restrained the defendant while a technician withdrew blood. The

---

[1]*Schmerber* v. *California* (1966) 384 U.S. 357 [16 L.Ed.2d 908, 86 S.Ct. 1826]; *Rochin* v. *California* (1952) 342 U.S. 165 [96 L.Ed. 183, 72 S.Ct. 205, 25 A.L.R.2d 1396].

court in *Ryan* found no violation of the *Rochin* standard because the police did not use more force than was necessary to overcome the defendant's resistance. In *Ryan,* police *did not engage* in any carotid restraint or wantonness, violence or beating.

The case at bench factually falls within the penumbra of cases commencing with the seminal case of *Rochin* v. *California, supra,* 342 U.S. 165 (stomach was forcefully pumped out), *People* v. *Rodriguez* (1977) 71 Cal.App.3d 547, 549 [139 Cal.Rptr. 509] (emetic was administered through a nasal tube), and *People* v. *Kraft* (1970) 3 Cal.App.3d 890, 895-896 [84 Cal.Rptr. 280] (blood samples were forcibly obtained), *People* v. *Sanders* (1969) 268 Cal.App.2d 802 [74 Cal.Rptr. 350] (swallowing was prevented by karate art-of-choking technique, carotid restraint), and *United States* v. *Cameron* (9th Cir. 1976) 538 F.2d 254, 256 (the defendant's rectal cavity was probed and an enema administered).

The leading case in California prohibiting the application of the carotid restraint, choke hold or the karate suppression technique is *People* v. *Sanders, supra,* 268 Cal.App.2d 802. In *Sanders* the judo choking technique (the precise technique as was used in this case) was applied in order to compel Sanders to spit an object out of his mouth. The officer in *Sanders* justified the choking technique as "very common." " 'It is a very humane hold. It doesn't leave any marks.' . . . This stops the person from swallowing, or eventually it stops the blood flow to the head, and he then passes out.' " (*Id.,* at p. 803.) Sanders contended the force used by police denied him due process of law. The appellate court agreed and reversed the judgment.

In *Sanders,* the Attorney General asserted there was in fact no choking and the force used was no more than reasonably necessary to prevent destruction of the evidence. He insisted the term "choking technique" was a misnomer for a legitimate judo competition hold.

Said the appellate court: "We are unable to accept this contention. Although the officer concluded that his technique was a 'very humane hold,' it appears to us that any application of force to one's neck or throat calculated to, and which does, as stated by the officer, stop 'the blood flow to the head, and then he passes out' constitutes choking or its equivalent." (*People* v. *Sanders, supra,* 268 Cal.App.2d 802, 805, fn. omitted.)[2]

---

[2]A footnote of *Sanders* relates:

"In the San Francisco Public Library we find a work (Bruce Tegner (1961), Judo for Fun, pp. 20-21—Library of Congress Catalog number 61-16761) wherein it is stated: 'Chokes must not be attempted by any Judo player unless there is a Black Belt instructor present who is trained in the art of resuscitation (Kappo or Katsu). It is foolish and dangerous to attempt choking techniques without this safety precaution. Although there are some instructors who,

The *Sanders* court reasoned: "It is argued that it is unreasonable to allow an officer to use such force as is necessary to accomplish a felon's arrest [citation], and yet deny to the officer a similar right to prevent destruction of the evidence of the felony. This assumption assumes that *choking* [italics in orig.] is ordinarily necessary to prevent a suspect from swallowing narcotics—an assumption apparently unsupported by experience. *And in any event, as an intermediate appellate court we must respect the clear directions of People v. Parham, supra, 60 Cal.2d 378, 384, prohibiting the choking of a suspect under the circumstances of this case.*" (*People* v. *Sanders, supra,* 268 Cal.App.2d 802, 805-806, italics added.) *People* v. *Parham* (1963) 60 Cal.2d 378, 384 [33 Cal.Rptr. 497, 384 P.2d 1001], says most explicitly: "Choking a man to extract evidence from his mouth violates due process."

Not only does *Sanders* rest on authoritative, controlling precedent but it has been cited with approval in recent Supreme Court cases of *People* v. *Scott* (1978) 21 Cal.3d 284, 293 [145 Cal.Rptr. 876, 578 P.2d 123], and *People* v. *Bracamonte* (1975) 15 Cal.3d 394, 405 [124 Cal.Rptr. 528, 540 P.2d 624], footnote 6. In *Bracamonte,* the Supreme Court said: "We certainly do not intend to curtail police efforts to prevent the destruction of evidence. Inasmuch as the mouth is not a sacred orifice and there is no constitutional right to destroy or dispose of evidence, attempts to swallow evidence can be prevented [citations] *as long as excessive force is not employed. (People v. Parham* (1963) 60 Cal.2d 378 . . .; *People* v. *Sanders* (1969) 268 Cal.App.2d 802 . . .; *People* v. *Erickson* (1962) 210 Cal.App.2d 177 . . .; *People* v. *Sevilla* (1961) 192 Cal.App.2d 570 . . .; *People* v. *Brinson* (1961) 191 Cal.App.2d 253 . . .; *People* v. *Martinez* (1954) 130 Cal.App.2d 54 . . . .)" (*Id.,* at p. 405.)

Recently, in *People* v. *Trevino* (1977) 72 Cal.App.3d 686 [140 Cal.Rptr. 243] (officer placed hand on defendant's throat), Justice Compton speaking for the unanimous court said: "As to the amount of force that is permissible the cases uniformly reject the use of choking as a means of preventing this destruction of evidence or forcing defendant to disgorge it." (*Id.,* at p. 691.)

---

unfortunately allow it, chokes against the windpipe should not be practiced. Chokes against the windpipe can be fatal. If *at any time* a windpipe choke is applied to you—you must submit immediately and refuse to practice with anyone who applies chokes of this nature. [¶] It requires more skill to apply Judo chokes properly, against the carotid artery. You must *not* apply even a *legal* choke without the presence of a Black Belt Instructor. *The legal choke against the carotid artery can cause unconsciousness and there is danger of serious permanent injury or even fatality if the unconscious person is not revived within a matter of minutes.*'

"This comment iterates what must be considered common knowledge—that any stoppage of the flow of blood to the head until one becomes unconscious is attended by serious danger." (*People* v. *Sanders, supra,* 268 Cal.App.2d 802, 805, fn. 1, italics added.)

Here the officer testified on one occasion he grabbed Carleton by the throat and on another occasion described applying pressure sufficient to prevent swallowing but not sufficient to cut off air. Justice Compton responds most aptly. *"The application of force to a person's throat is a dangerous and sensitive activity. It is the type of force that, more than any other, is likely to result in violent resistance by the arrestee."* (*Trevino, supra,* at p. 692.) Justice Compton's nonimprimatur, standing alone, should settle any doubt on the matter. Such barbarous acts can in no wise come under the heading of "accepted medical practices." The danger of serious permanent injury and even fatality is "common knowledge." (*People* v. *Sanders, supra,* 268 Cal.App.2d 802, 805, fn. 1.) Rather, as *People* v. *Parham, supra,* 60 Cal.2d 378, holds, it is a blatant violation of due process to engage in such procedures. The acts of the police officers here "do more than offend some fastidious squeamishness or private sentimentalism about combatting crime too energetically. This is conduct that shocks conscience." (*Rochin* v. *California, supra,* 342 U.S. 165, 172 [96 L.Ed. 183, 190].)

The judicial determination of due process must heed and consider carefully the means used to obtain otherwise relevant and credible evidence. To sanction a brutal life endangering choke-out is to afford brutality the cloak of law. "Nothing would be more calculated to discredit law and therefore to brutalize the temper of a society." (*Rochin, supra,* at pp. 173-174 [96 L.Ed. at p. 191].)

### III

The trial court here improvidently relied upon *People* v. *Kraft, supra,* 3 Cal.App.3d 890, in assessing whether due process was violated. In *Kraft,* an officer pushed the arrestee and another officer hit the arrestee in the cheek. The appellate court noted that greater restraints were necessarily to be condoned with an obstreperous, belligerent drunk. Nevertheless, the *Kraft* court held the officers violated the *Rochin* standard because they were aggressive beyond all need. The trial court distinguished *Kraft* in that there the defendant was defensive and the officers' conduct was unnecessarily aggressive. The defensive/aggressive dichotomy is pure nonrelevant sophistry. The facts are clear: Carleton resisted (defensively or aggressively) the taking of his blood. He was choked into submission.

The court here concluded: "In sum, considering the totality of circumstances, the conscience of the court is not shocked, that the conduct of the police officers, although they had to use considerable strength and restraint on the defendant, was necessary because the defendant, himself, was resistive and aggressive."

This is not a proper *Rochin* analysis. It is incomplete. We are required to accept the trial court's conclusion Carleton was "aggressively resisting"; however, the determination the force used was necessary for control rather than punitive in nature does not end the *Rochin* inquiry. If such were the law then the police could lawfully and unmercifully batter an aggressively-resisting defendant into submission if it was necessary to obtain control. Such is not the law; the end does not justify an unlawful or barbarous means. Evidence of guilt may not be extracted by unlawful, barbaric means. The application of a choking force to a person's throat is a dangerous and sensitive activity. It is a violation of due process. (*People* v. *Parham, supra.*)

Under *Rochin,* it is not enough to question whether the means were necessary to accomplish the objective of obtaining the otherwise relevant and credible evidence. The court must also question whether the means justify the end. The conduct of the officers in using a carotid suppression hold reached a degree of brutality so as to authorize the refusal of admission of evidence by a court of law.

## IV

The majority further errs in its failure to analyze the implied consent law (Veh. Code, § 13353) and explicate the legislative intent which compelled the enactment of this law. *People* v. *Superior Court (Hawkins)* (1972) 6 Cal.3d 757, 764-765 [100 Cal.Rptr. 281, 493 P.2d 1145], is most instructive on this issue. There, the Supreme Court pointed out that under *Schmerber, supra,* a person who has been lawfully arrested may have a blood sample forcibly removed without his consent provided it is done in a reasonable medically approved manner and provided the arresting officer had probable cause to believe the arrestee was intoxicated. "*[N]evertheless such an episode remains an unpleasant undignified and undesirable one.*" (*Id.,* at p. 764.)

The Supreme Court explained: "[T]he shocking number of injuries and deaths on the highways caused by drunk drivers has compelled society to adopt extreme measures in response. By its enactment in 1966 of section 13353, the Legislature devised an additional or alternative method of compelling a person arrested for drunk driving to submit to a test for intoxication, providing that such person will lose his automobile driver's license for a period of six months if he refuses to submit to a test for intoxication. The effect of this legislation is to equip peace officers with an instrument of enforcement not involving physical compulsion. It is noteworthy in so doing, the Legislature took pains to condition its use upon a lawful arrest for driving under the influence of intoxicating liquor and upon the reason-

able belief of the peace officer that the arrestee was in fact so driving." (*People* v. *Superior Court (Hawkins), supra,* 6 Cal.3d 757, 765.)

The Supreme Court became more explicit in *Hernandez* v. *Department of Motor Vehicles* (1981) 30 Cal.3d 70, 77 [177 Cal.Rptr. 566, 634 P.2d 917], where it said: "Prior to the enactment of the statute, both this court and the United States Supreme Court had explicitly held that when a person has been lawfully arrested for drunk driving the police, utilizing appropriate medical procedures, may *forcibly* [italics in orig.] remove a blood sample from the driver without his consent. [Citations.] Despite the legality of such coercive procedure, however, the Legislature recognized that 'such an episode remains an unpleasant, undignified and undesirable one.' (*People* v. *Superior Court (Hawkins)* (1972) 6 Cal.3d 757 . . . .) *In enacting section 13353, the Legislature sought to obviate these consequences for the driver and 'avoid the possible violence which could erupt if forcible tests were made upon a recalcitrant and belligerant inebriate'* (*Anderson* v. *Cozens, supra,* 60 Cal.App.3d 131, 143), while at the same time preserving the state's strong interest in obtaining the best evidence of the defendant's blood alcohol content at the time of the arrest." Thus "the Legislature devised an additional or alternative method of compelling a person arrested for drunk driving to submit to a test for intoxication, by providing that such person will lose his automobile driver's license for a period of six months if he refuses to submit to a test for intoxication. *The effect of this legislation is to equip peace officers with an instrument of enforcement not involving physical compulsion.*" (*People* v. *Superior Court (Hawkins), supra,* 6 Cal.3d 757, 765, italics added.)

The Supreme Court in *People* v. *Bracamonte, supra,* 15 Cal.3d 394, 404, has said: "We are mindful of the Supreme Court's warning in *Schmerber* that '[t]he integrity of an individual's person is a cherished value of our society. *That we today hold that the Constitution does not forbid the State's minor intrusions into an individual's body under stringently limited conditions in no way indicates that it permits more substantial intrusions, or intrusions under other conditions.*' (*Schmerber* v. *California,* 384 U.S. 757, 772 . . . .)" The Supreme Court concluded: "We reiterate that a search, even if justified at its inception, may be unconstitutional *by virtue of its intolerable intensity and scope. Furthermore, the use of excessive force which shocks the conscience violates due process of law.*" (*Id.,* at pp. 404-405, italics added.)

V

Further grounds exist for the issuance of the writ. In *Schmerber* v. *California, supra,* 384 U.S. 375, the United States Supreme Court correctly

perceived it was dealing with evidence (alcohol in the blood stream) that was evanescent in nature. In view of the nature of that evidence the procedures employed to secure it and maintain its viability justified the intrusion without first resort to the search warrant procedure. The evidence in this case indicated a telephonic warrant could be obtained in an expeditious manner—in fact in a matter of minutes. Furthermore, the state of the art concerning scientific preservation of blood, analysis of blood alcohol content and the current abilities to "back track" a blood alcohol content, make antiquated the *Schmerber* premise the evanescent character of the evidence justifies avoiding the search warrant procedure. Nowhere in this evidence can there be found an emergency or exigency to warrant the forcible removal of the fluids from Carleton's body. *People* v. *Superior Court (Hawkins), supra,* 6 Cal.3d 757, points out the prosecution must show an overwhelming need justified the intrusion without a warrant, that the exigency of the situation made the immediate and forcible removal imperative. *(Id.,* at p. 763.) Finally, as the Supreme Court said: "[T]he burden is on the People to show *an overwhelming need* that would justify a search without a warrant [enforcible extraction situations]. 'The exceptions [to the requirement of a warrant] are 'jealously and carefully drawn,' [citation] and there must be 'a showing of those who seek exemption . . . that the exigencies of the situation made that course imperative.' [Citation.] '[T]he burden is on those seeking the exemption to show the need for it.' [Citation.]" *(Ibid.)*

For each of these reasons the writ should issue.

Petitioner's application for review by the Supreme Court was denied December 11, 1985. Bird, C. J., and Mosk, J., were of the opinion that the application should be granted.